Douglass G. **LUNDMAN**, as trustee for the next of kin of Ian Douglass Lundman, deceased, Respondent,

v.

Kathleen **McKOWN** (C2–94–897), William McKown (C5–94–893), Mariano Victor Tosto (C3–94–892), Quinna Lamb, n/k/a Quinna Giebelhaus (C1–94–891), Clifton House, Inc. (C9–94–895), Appellants,

Metropolitan Open School, Defendant,

The First Church of Christ, Scientist (C0–94–896), James Van Horn (C7–94–894), Appellants.

Nos. C1–94–891, C3–94–892, C5–94–893, C7–94–894, C9–94–895, C0–94–896 and C2–94–897.

Court of Appeals of Minnesota.

April 4, 1995.

Review Denied May 31, 1995.

 
 

 
 

 

James H. Kaster, Nichols, Kaster & Anderson, Minneapolis, Robert J. Bruno, Robert J. Bruno & Associates, Burnsville, for respondent Douglass G. Lundman, as trustee for the next of kin of Ian Douglass Lundman, deceased.

Terrence J. Fleming, Ansis V. Viksnins, Lindquist & Vennum, Minneapolis, for appellant Kathleen McKown.

Ronald J. Riach, Franke & Riach, Roseville, for appellant William McKown.

Larry B. Leventhal, Michael C. Hager, Larry B. Leventhal & Associates, Minneapolis, for appellant Mariano Victor Tosto.

D. Patrick McCullough, McCullough, Smith & Wright, St. Paul, for appellant Quinna Lamb, n/k/a Quinna Giebelhaus.

Donna J. Blazevic, Charles E. Lundberg, Gregory W. Deckert, Bassford, Lockhart, Truesdell & Briggs, P.A., Minneapolis, for appellant Clifton House, Inc.

Terrence J. Fleming, Ansis V. Viksnins, William G. Christopher, Holland & Knight, Tampa, FL, for appellant The First Church of Christ, Scientist.

Wendy J. Wildung, Sidney J. Spaeth, Faegre & Benson, Minneapolis, Seth M. Colton, Maun & Simon, P.L.C., St. Paul, for appellant James Van Horn.

Stanton Gregg Kunzi, Hogan & Hartson, L.L.P., Washington, DC, for amici curiae American Academy of Pediatrics, American Medical Ass'n, Minn. Chapter of American Academy of Pediatrics, and Minn. Medical Ass'n.

Steven K. Green, Americans United for Separation of Church and State, Washington, DC, for amicus curiae Americans United for Separation of Church and State, in Support of Appellant, The First Church of Christ, Scientist.

Karl L. Cambronne, Jeffrey D. Bores, Chestnut & Brooks, P.A., Minneapolis, William S. Fallon, Chancellor, The Archdiocese of St. Paul and Minneapolis, St. Paul, for amicus curiae The Archdiocese of St. Paul and Minneapolis, et al.

Peter M. Lancaster, Timothy E. Branson, Paul J. Robbennolt, Dorsey & Whitney, Minneapolis, for amicus curiae Minn. Civ. Liberties Union.

Michael Weiner, Yaeger, Jungbauer, Barczak & Roe, Sharon L. Van Dyck, Schwebel, Goetz, Sieben & Moskal, Minneapolis, for amicus curiae The Minn. Trial Lawyers Ass'n.

Considered and decided by KLAPHAKE, P.J., DAVIES and MULALLY,* JJ.

## OPINION

DAVIES, Judge.

The parties appeal from a judgment imposing liability and the denial of their posttrial motions in this wrongful death action. We affirm as to some parties and reverse as to others.

## FACTS

Ian Lundman died at age 11 from juvenile-onset diabetes following three days of Christian Science care. A medical professional would have easily diagnosed Ian's diabetes from the various symptoms he displayed in the weeks and days leading up to his death (particularly breath with a fruity aroma). Although juvenile-onset diabetes is usually responsive to insulin, even up to within two hours of death, the Christian Science individ-

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

uals who cared for Ian during his last days failed to seek medical care for him—pursuant to a central tenet of the Christian Science religion. This wrongful death action followed.

We begin the morning of May 6, 1989, when, after having been ill and lethargic intermittently for several weeks, 11-year-old Ian Lundman complained to his mother that he was again not feeling well, specifically that he had a stomachache. Ian's mother, appellant Kathleen McKown (mother), noticed that Ian had lost a "noticeable" amount of weight, had a fruity aroma on his breath, and lacked his normal energy. Consistent with the tenets of the Christian Science church, which she espoused, mother began treating Ian through prayer. Throughout the day, Ian continued to complain of a stomachache.

When Ian again complained to his mother about not feeling well the next morning (day two), she became more concerned. Because the Christian Science Church recommends that a journal-listed practitioner be hired when a parent is concerned about a child's health, mother contacted appellant Mario Tosto regarding Ian's condition. As a "journal-listed" practitioner, Tosto appears in a Christian Science publication as someone who is specially trained to provide spiritual treatment through prayer. Mother hired Tosto to begin praying for Ian.

When, despite his illness, Ian attended Sunday School that morning, his Sunday School teacher observed that he appeared tired. Ian's mother was concerned about his low energy level and his continued need to eat mints to mask his breath odor. She noted during an afternoon visit to his grandmother's home that the usually-active Ian lacked energy to do anything but lie on the sofa. Ian also vomited while at his grandmother's home.

Ian was unable to sleep the night of May 7, and several times in the early morning hours of May 8 (day three) he complained of illness, seeking his mother's help and comfort and stating that he did not want to be alone. Ian's fear of being alone caused mother to have still greater concern. At this point, the downward spiral of Ian's health accelerated. He was unable to keep any food down that morning; Ian's visible weight loss, coupled with his inability to eat, caused mother to fear that her son might die.

Seeking further outside help, mother and appellant William McKown (her husband and Ian's stepfather) made several telephone calls on day three. First, pursuant to church directives, mother contacted appellant James Van Horn, who served as the one-person Christian Science Committee on Publications (CoP) for Minnesota. Learning that she intended to rely on Christian Science care, Van Horn verified that mother had contacted a journal-listed practitioner; and he later notified appellant The First Church of Christ Scientist (First Church) in Boston, that a child of a Christian Scientist was seriously ill. (First Church is known as the "mother" church of Christian Science.)

Second, mother called a Christian Science nursing home, appellant Clifton House, and a nurse advised her to give Ian small quantities of liquids. Third, William McKown (who is also a Christian Scientist) made a follow-up call to Van Horn because, fearing that Ian might be suffering from a contagious disease, he wanted Van Horn to give him telephone numbers for state or local health departments. (The church, as a regular practice, alerts Christian Scientists to the legal requirement to report contagious disease.) Fourth, William McKown called Clifton House again and told the nurse that Ian was not drinking the liquids that had previously been suggested.

Ian's condition worsened throughout day three; by that afternoon he was unable to eat, drink, or even communicate with others, and he could not control his bladder. He had to be carried to join his family at dinner, and at one point, looking at his mother and not recognizing her, said, "My name is Ian, too." This disorientation reinforced her concern that Ian's condition was life-threatening.

At approximately 8:00 p.m., mother called Clifton House, seeking to have Ian admitted. But Clifton House regulations prohibit admitting anyone under 16, so mother decided that she would take Ian to North Memorial Hospital. Mother dismissed the idea of seeking medical help, however, when Ellen

Edgar, the on-duty nurse at Clifton House, proposed hiring a private Christian Science nurse to come to the McKown home. Edgar told mother that she would try to have a Christian Science nurse who took in-home cases call the McKowns.

Edgar subsequently called appellant Quinna Lamb, a journal-listed Christian Science nurse and, at the time, off-duty from Clifton House. Edgar told Lamb about Ian and asked if she was available. Lamb told Edgar that she knew the McKowns and would offer her services to them. Lamb subsequently called mother, who accepted Lamb's offer and hired her to provide home nursing services.

When she arrived at the McKowns' home at about 9:00 p.m., Lamb called Van Horn, notifying him that she was now assisting in Ian's care. This was the third call to Van Horn, and last until after Ian's death. Lamb then commenced caring for Ian and reading hymnals to him. Throughout the evening, mother and Lamb also contacted Tosto by telephone concerning Ian's worsening condition. Although he assisted mother and Lamb in caring for Ian earlier in the evening, William McKown went to sleep about 11:00 p.m.

At approximately 2:36 a.m. on May 9 (day four), Ian died.

Kathleen and William McKown were subsequently charged with second degree criminal manslaughter. The district court dismissed the indictments, however, and this court and the Minnesota Supreme Court affirmed in *State v. McKown*, 461 N.W.2d 720 (Minn.App.1990), *aff'd*, 475 N.W.2d 63 (Minn. 1991), *cert. denied*, 502 U.S. 1036, 112 S.Ct. 882, 116 L.Ed.2d 786 (1992).

In April 1991, respondent Douglass G. Lundman, Ian's natural father, was appointed trustee of Ian's estate and commenced this wrongful death action on behalf of himself and Ian's older sister Whitney. Lundman filed suit against the appellants: William and Kathleen McKown; Quinna Lamb; Mario Tosto; James Van Horn; Clifton House, Inc.; and The First Church of Christ, Scientist. The complaint alleged, among other things, negligence in failing to provide,

obtain, or recommend medical treatment for Ian.

Following a seven-week trial in July and August 1993, the jury returned a special verdict finding all appellants negligent and dividing liability as follows: Kathleen McKown, 25 percent; William McKown, 10 percent; Tosto, 10 percent; Lamb, 5 percent; Clifton House, 20 percent; Van Horn, 20 percent; and First Church, 10 percent. After awarding $5.2 million in compensatory damages, the jury, in a separate proceeding against the church alone, awarded $9 million in punitive damages.

Appellants moved for J.N.O.V., a new trial, or remittitur of damages. The trial court denied all posttrial motions except for a remittitur of the compensatory damages from $5.2 million to $1.5 million. Judgment was entered and this appeal followed.

## ISSUES

I. Is the award of punitive damages for actions based on the teaching of church doctrine unconstitutional?

II. Did this action violate appellants' constitutional rights to freedom of religion or due process?

III. With respect to the negligence issues:

A. Did the trial court legally err in finding a duty of care or in applying the standard of care?

B. Are the jury findings on breach of duty and causation perverse or palpably contrary to the evidence?

IV. With respect to the trial:

A. Did the trial court abuse its discretion and prejudicially err in admitting and excluding evidence?

B. Did the trial court abuse its discretion by allowing improper closing argument?

C. Did the trial court err as a matter of law in instructing the jury?

V. Did the trial court abuse its discretion in ordering remittitur?

## ANALYSIS

### I.

### PUNITIVE DAMAGES

We first address appellant church's challenge to the award of punitive damages.

■ Punitive damages serve to punish wrongdoers and deter others from similar conduct. *Shetka v. Kueppers, Kueppers, Von Feldt & Salmen,* 454 N.W.2d 916, 920 (Minn. 1990). In those instances where deterrence will not be achieved, punitive damages should not be awarded. *Lewis v. Equitable Life Assurance Soc'y,* 389 N.W.2d 876, 892 (Minn. 1986). Respondent argues that the punitive damages award is a permissible deterrent because it "persuade[s] the First Church not to interfere in the direct care of seriously-ill children."

■ For three independent reasons we hold that punitive damages may not be imposed. First, there is no evidence that the church directly interfered in Ian's care and insufficient evidence as a matter of law that it interfered by agency through his caregivers. Hence, there is no past *conduct* by the church of the kind justifying punitive damages. The punitive damage award must be reversed on that ground alone.

■ Second, even were we to recognize an agency relationship, the punitive damages award would still fall because it is unconstitutional, as the church and two amici assert.[1] They question the constitutionality of imposing punitive damages on a church to force it to abandon teaching its central tenet. We find the argument compelling.

In closing argument in the action for punitive damages, respondent's attorney compared the church's involvement to a weed, arguing:

1. The Americans United for Separation of Church and State submitted an amicus curiae brief opposing the imposition of punitive damages, as did a group of 11 religious organizations of various denominations.

Two briefs supporting the imposition of punitive damages were submitted by amici curiae representing, first, the Minnesota Trial Lawyers Association, and, second, the American Academy of Pediatrics, the American Medical Association, and the Minnesota chapters of these associations.

I see weeds on the lawn and I can sit there and pick at the surface of weeds all day long, but until you dig underneath and get the root of the weed, the weed will come back again and again and again.

Respondent's attorney explained why respondent sought punitive damages only from the church:

[I]t is with the First Church that you go below the surface of these policies. If you want to establish a change, if you want to deter and make a difference, it is against the First Church that [a] punitive damage award will make a difference.

As these statements suggest, the main conduct of the church on which the punitive damages award was based is its espousal and promotion of spiritual treatment as a means of care, and on its concomitant failure to train Christian Science practitioners and nurses to perform or seek medical diagnoses.

■ The church's espousal of spiritual treatment is, however, entitled to substantial free exercise protection. *See Thomas v. Review Bd.,* 450 U.S. 707, 713, 101 S.Ct. 1425, 1430, 67 L.Ed.2d 624 (1981) (religious beliefs protected by the Free Exercise Clause). The constitutional right to religious freedom includes the authority of churches to independently decide matters of faith and doctrine. *Kedroff v. St. Nicholas Cathedral,* 344 U.S. 94, 116, 73 S.Ct. 143, 154, 97 L.Ed. 120 (1952).

■ We do not grant churches and religious bodies a categorical exemption from liability for punitive damages. But under these facts, the risk of intruding—through the mechanism of punitive damages—upon the forbidden field of religious freedom is simply too great.

Finally, the Minnesota Civil Liberties Union submitted a brief arguing that tort liability is not violative of appellants' right to freedom of religion, and that a standard of care based on a reasonable Christian Scientist standard or Minnesota statutes (if read as absolving of liability) would be an unconstitutional establishment of religion. The Civil Liberties Union did not directly discuss the constitutionality of punitive damages.

■ A third, independent reason the punitive damages award must be reversed is that it violates the Minnesota statute on punitive damages. That statute requires "clear and convincing evidence" that the defendant showed a "deliberate disregard" for the rights or safety of others. Minn.Stat. § 549.20, subd. 1(a) (1992). This statutory standard is met where the defendant has "knowledge of facts or intentionally disregards facts that create a high probability of injury" to others *and* the defendant "deliberately proceeds to act in conscious or intentional disregard of the high degree of probability of injury." *Id.*, subd. 1(b) But,

> [g]ood faith is a proper defense to punitive damages, even though defendants might have been mistaken in their belief that a party was in jeopardy or that their actions were correct.

*Peterson v. Sorlien*, 299 N.W.2d 123, 129 (Minn.1980), *cert. denied*, 450 U.S. 1031, 101 S.Ct. 1742, 68 L.Ed.2d 227 (1981).

Here, the punitive damages award must be reversed because it is unchallenged that all defendants, including the church, acted in good faith. And there is no "clear and convincing evidence" that the church acted in "deliberate disregard" of Ian's rights. The church's only contact with Ian was when Van Horn told officials of the church in Boston that a Christian Science parent in Minnesota was using spiritual care for her seriously-ill child. Knowledge of illness is insufficient, by itself, to support an award of punitive damages.

We also note that the church teaches its members to "obey" all laws, including the reporting of contagious disease to local authorities. This, too, suggests the church lacked the malice required under Minnesota law for the imposition of punitive damages.

## II.

## CONSTITUTIONAL ISSUES ON COMPENSATORY DAMAGES

Appellants raise two constitutional challenges to the award of compensatory damages.

### A. Freedom of Religion

Appellants first argue that the religious freedoms guaranteed by the Minnesota and United States constitutions preclude an award of compensatory damages.

### 1. Absolute Freedom of Belief Does Not Extend to Conduct

Appellants generally argue that permitting this case to proceed improperly placed the Christian Science religion on trial and that allowing the jury to evaluate the reasonableness of appellants' conduct—which conformed to their genuine religious beliefs— amounted to an evaluation of those beliefs.

■ We disagree. Although one is free to believe what one will, religious freedom ends when one's conduct offends the law by, for example, endangering a child's life. *Cantwell v. Connecticut*, 310 U.S. 296, 303–04, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940) (First Amendment "embraces two concepts—freedom to believe and freedom to act"). Courts have consistently distinguished between the absolute liberty to believe (which the government may not restrict) and the limited liberty to *act* in furtherance of religious belief (which the government may reasonably restrict). *E.g., United States v. Lee*, 455 U.S. 252, 261, 102 S.Ct. 1051, 1057, 71 L.Ed.2d 127 (1982) (conflicting religious belief affords no excuse for resisting payment of taxes); *Gillette v. United States*, 401 U.S. 437, 463, 91 S.Ct. 828, 843, 28 L.Ed.2d 168 (1971) (conflicting religious belief affords no excuse for resisting compulsory military service); *Prince v. Massachusetts*, 321 U.S. 158, 171, 64 S.Ct. 438, 444, 88 L.Ed. 645 (1944) (conflicting religious belief affords no excuse for violating child labor laws).

In *Reynolds v. United States*, the Supreme Court upheld a Mormon's criminal conviction for polygamy, and stated:

> Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices. * * * Can a man excuse his practices to the contrary because of his religious belief? To permit this would be to make the professed doctrines of religious beliefs superior to the

law of the land, and in effect permit every citizen to become a law unto himself.

98 U.S. 145, 166–67, 25 L.Ed. 244 (1878). Appellants are free to believe what they will—and to teach and preach what they believe. But, when beliefs lead to conduct, the conduct is subject to regulation. Here, regulation is necessary for the protection of children and appellants' conduct, though rooted in religion, is subject to state regulation.

But even conduct—when religiously driven—enjoys some constitutional protection, so we next evaluate the constitutionality of a tort-liability sanction against appellants' conduct.[2]

### 2. Balancing Test Applied to Conduct

■■■ Minnesota courts balance the state's interest against the actor's free-exercise interest in religious-based conduct. *See Hill–Murray Fed'n of Teachers v. Hill–Murray High School,* 487 N.W.2d 857, 865 (Minn. 1992) (retaining compelling state interest balancing test).[3] Where, as here, it is undisputed that the religious belief is sincerely held and that the religious belief would be burdened by the proposed regulation, the balancing test requires proof of a compelling state interest. *Id.* at 866–67. Here, appellants concede that Minnesota has a compelling interest in protecting the welfare of children, and case law supports that conclusion. *See, e.g., In re Hamilton,* 657 S.W.2d 425, 429 (Tenn.Ct.App.1983) (state has compelling interest in chemotherapy for child over parents' religious objections), *appeal denied* (Tenn. Sept. 29, 1983).

There must also be no less-restrictive means to accomplish the state's goal, here to ensure the safety of children. Appellants argue that there are less-restrictive alternatives to this civil action, citing the unpublished decision of the Michigan Court of Appeals in *Brown v. Laitner,* No. 73903 (Mich. Ct.App. Dec. 17, 1986).

■■■ But appellants are bound by Minnesota law, not Michigan law; and the statutes in the two states differ. We do not believe that the Minnesota legislature sought to limit its rights as *parens patriae* by simply exempting spiritual healers from *criminal* child neglect statutes or by exempting Christian Scientists from laws that forbid practicing medicine without a license.

Although we agree that Minnesota statutes include some accommodation to the Christian Science religion, the statutes should not be read as authorizing reliance on prayer as a sole treatment for seriously-ill children under *all* circumstances or (by implication) as proscribing civil lawsuits. The statutes simply indicate the legislature's willingness to tolerate this religious practice—up to a point. We reject appellants' argument that the Minnesota legislature has sanctioned prayer alone to treat a child battling a life-threatening disease.

Appellants also argue that there are two less-restrictive alternatives that would serve Minnesota's interest in protecting children: mandated notice to public authorities when a seriously-ill child is being treated by spiritual means, and criminal prosecution of a custodial parent in case of death.

But the first alternative—a reporting requirement—does not always work and therefore is not a preclusive alternative. *See Hermanson v. State,* 570 So.2d 322, 328–29 (Fla. Dist.Ct.App.1990) (seven-year-old diabetic died in spite of Florida's criminally sanctioned reporting requirements), *rev'd,* 604 So.2d 775 (Fla.1992); *see also Walker v. Superior Court,* 47 Cal.3d 112, 253 Cal.Rptr. 1, 763 P.2d 852, 871 (1988) (authorities generally will not learn of faith healing unless and until someone dies), *cert. denied,* 491 U.S. 905, 109 S.Ct. 3186, 105 L.Ed.2d 695 (1989).

Likewise, criminal liability is not a preclusive less-restrictive alternative because it is fallible and requires that the state, rather

---

**2.** The McKowns, Tosto, Lamb, Clifton House, and Van Horn all defer to First Church for argument on this issue. And the church concedes that "[t]he state has a compelling interest in protecting the lives of its children when they are seriously ill."

**3.** Minnesota's Constitution provides greater protection than does the U.S. Constitution. *Hill–Murray,* 487 N.W.2d at 864–65. Accordingly, we need not discuss federal constitutional law.

than private parties, expend resources to bring forth a corrective response.

■ It is appropriate that disputes involving the consequences of religious-based conduct be brought before the civil courts where, as here, the underlying lawsuit is not a vehicle for attacking religious belief. *See Mrozka v. Archdiocese of St. Paul & Minneapolis*, 482 N.W.2d 806, 811 (Minn.App.1992) (permitting litigation of child sexual abuse claims against church), *pet. for rev. denied* (Minn. May 24, 1992); *Black v. Snyder*, 471 N.W.2d 715, 721 (Minn.App.1991) (permitting litigation of sexual harassment claim against church), *pet. for rev. denied* (Minn. Aug. 29, 1991). We rule that the trial court could adjudicate this action without offending the right to free exercise of religion.[4]

## B. Due Process

■ Appellants next argue that this action for compensatory damages should be dismissed based on *State v. McKown* (*McKown I*), which held that a criminal prosecution violated the McKown's constitutional rights of due process notice. 475 N.W.2d 63, 68–69 (Minn.1991).

*McKown I* turned entirely on whether an exception in the child neglect statute effectively caused the criminal manslaughter statute to fall short of satisfying "the fair notice requirement inherent to the concept of due process." *Id.* at 68. But this is a civil action based on common-law negligence, and any confusion on what appellants could or could not lawfully do without being subject to *civil liability* is of much less force than uncertainty as to what they could or could not do before being subject to *criminal prosecution. See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982) (courts have a "greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe").

It is significant also that this case is based on common law negligence, as distinguished from a claim created by the legislature. The common law derives its authority solely from custom and use; it originates as courts recognize, affirm, and enforce such customs and uses. *See Kansas v. Colorado*, 206 U.S. 46, 96–97, 27 S.Ct. 655, 667, 51 L.Ed. 956 (1907) (courts establish principles of common law). As a product of the courts, the common law has developed case by case in response to social needs; the common law has evolved gradually as society has changed and new rights have been recognized. *Sullivan v. Minneapolis & Rainy River Ry.*, 121 Minn. 488, 494–95, 142 N.W. 3, 5 (1913). Our decision today is simply one more effort to ascertain and apply what is just.

It should not be a surprise when a rule of common law is first applied retrospectively as, to a degree, we do in this case. That the rights awarded and obligations imposed in this case may not have been perfectly perceived yesterday is of little constitutional concern. Even if some rights and obligations were recognized here for the first time, we would still have no concern about constitutionality. *See Miller v. Monsen*, 228 Minn. 400, 406, 37 N.W.2d 543, 547 (1949) (common law principles "are susceptible of adaptation to new conditions, interests, relations, and usages as the progress of society may require").

There is, however, substantial precedent for overriding religious belief in matters of health—and liability should have been foreseen. *See, e.g., Jehovah's Witnesses v. King County Hosp. Unit No. 1 (Harborview)*, 278 F.Supp. 488, 508 (W.D.Wash.1967) (appointing guardians for children to provide medical care consent), *aff'd per curiam*, 390 U.S. 598, 88 S.Ct. 1260, 20 L.Ed.2d 158 (1968); *Hamilton*, 657 S.W.2d at 429 (allowing chemotherapy over parent's religious objections); *Custody of a Minor*, 375 Mass. 733, 379 N.E.2d 1053, 1066 (1978) (affirming order for continuation of chemotherapy); *In re Sampson*, 29 N.Y.2d 900, 328 N.Y.S.2d 686, 687, 278

---

4. We are, of course, mindful of the clearly forbidden entanglement that occurs if courts are used to "pursue" religious "error," or to conduct attacks on firmly held religious beliefs. But religious error is not at issue here, and this case is

not a mask for religious persecution. The salient inquiry is into common law negligence, with appellants' religious beliefs playing a critical role.

N.E.2d 918, 919 (1972) (per curiam) (authorizing surgery, including blood transfusions, to correct non-life-threatening physical impairment notwithstanding parental religious objections).

The due process requirement of fair notice has not been violated.

## III.

### SUBSTANTIVE ISSUES RELATING TO NEGLIGENCE

The basic elements of a negligence claim are (1) the existence of a duty, (2) breach of that duty, (3) injury proximately caused by the breach, and (4) damages. *Schweich v. Ziegler, Inc.,* 463 N.W.2d 722, 729 (Minn.1990). Appellants challenge the existence of a duty of care and a breach of that duty.

### A. Duty of Care

Where the facts are not in controversy, the existence of duty is a question of law. *Carlson v. Mutual Serv. Ins.,* 494 N.W.2d 885, 887–88 (Minn.1993).

Generally, there is a duty to aid another only if a "special relationship" exists between the parties. *Harper v. Herman,* 499 N.W.2d 472, 474 (Minn.1993). A special relationship exists where one party has custody of another under circumstances that deprive the other of normal opportunities of self-protection. *Id.* That is,

> "the plaintiff is typically in some respect particularly vulnerable and dependent upon the defendant who, correspondingly, holds considerable power over the plaintiff's welfare."

*Id.* at 474 n. 2 (quoting W. Page Keeton et al., *Prosser and Keeton on the Laws of Torts* § 56, at 374 (5th ed. 1984)). A special relationship may also arise where one accepts responsibility to protect another, although there was no initial duty. *Walsh v. Pagra Air Taxi, Inc.,* 282 N.W.2d 567, 570 (Minn. 1979).

Kathleen McKown does not dispute that she owed a duty of care to her son. A custodial parent has a special relationship to a dependent and vulnerable child that gives rise to duty to protect the child from harm. *Delgado v. Lohmar,* 289 N.W.2d 479, 483–84 (Minn.1979). The other appellants argue, however, that they had no duty of care and that the trial court erred as a matter of law in holding that they each had special relationships with Ian. We examine the duty of each of these appellants separately.

### 1. William McKown

William McKown argues that he owed no legal duty to Ian because he was a stepparent and because Kathleen McKown was solely responsible for making decisions about Ian's health care. Although we recognize that, as a stepparent, William McKown usually had no "final word" control over Ian's health care, we disagree that his relationship as a stepparent did not impose a duty of care.

The record indicates that William McKown acted consistent with a special relationship existing between Ian and him. During Ian's last days, William McKown was fully aware of the gravity of Ian's condition, was frequently present as an on-the-scene caregiver, and attempted to assist Ian in several ways. He made telephone calls on Ian's behalf—calling Van Horn, when he feared Ian might be suffering from a contagious disease, and Clifton House, when Ian was unable to drink liquids or eat food. Because Ian could not walk or talk, William McKown carried Ian from his bed to the table in an attempt to offer him food and liquid (as suggested by Clifton House) and companionship. Finally, although he did not remain awake through the night when Ian died, William McKown testified that he spent most of that evening "in the doorway [to Ian's room] making sure I could be summoned for help, if necessary." These facts support the finding that William McKown knew of Ian's helplessness and the gravity of his situation, that he accepted a responsibility to protect Ian, and that a special relationship existed between the two.

Independent of William McKown's conduct during Ian's final illness, we believe there also is a presumption that "custodial" stepparents (and "visitation" stepparents during visitation) assume special-relationship

duties to stepchildren. *See London Guar. & Accident v. Smith,* 242 Minn. 211, 215, 64 N.W.2d 781, 784 (1954) (stepparent who assumes obligations incident to parental relation assumes parental status and an obligation to discharge parental duties); *see also Simmons v. Simmons,* 486 N.W.2d 788, 791 (Minn.App.1992) (discussing stepparent's right to visitation). The partnership involved in marriage is presumed to extend to care of children, absent some most unusual disclaimer. *See Iowa ex rel. Gilman v. Bacon,* 91 N.W.2d 395, 399 (Iowa 1958) (one merely standing in place of parent may disclaim child care responsibilities at any time). There was no disclaimer in this case.

This special relationship may, to a significant extent, be viewed as a responsibility delegated to him by, or subject to veto by, Kathleen McKown. But even so, he could not hide behind the natural parent. Regardless of who had ultimate authority in overseeing Ian's care, William McKown, bearing an in loco parentis responsibility for Ian's well-being, was obligated to put Ian's interests first—above and beyond Kathleen McKown's interest in exercising her religious beliefs.

Our holding is not intended to affect the legal responsibilities of stepparents to their stepchildren in different factual situations. Rather, our recognition of a duty is based on our conclusion that a stepparent may not avoid responsibility by simply pointing to the natural parent and proclaiming that the parent had legal control over and full responsibility for the child.

Here, the law required that William McKown step forward to rescue Ian.

**2. Quinna Lamb**

■ Appellant Quinna Lamb, the Christian Science nurse hired by Kathleen McKown to care for Ian in the McKown home, argues that she did not have a duty of care.

We disagree. Both indicia of a "special relationship" apply: Lamb had significant "custody or control" of Ian under circumstances where Ian lacked even his limited minor's capacity for self-protection—that is why mother hired Lamb—and she accepted the responsibility to care for Ian and to protect him by providing professional services in return for cash wages.

When she arrived, Lamb found Ian lying in his own urine, unable to walk, talk, or breath normally.[5] Lamb immediately began providing Christian Science nursing services: she read hymns and prayers to Ian, comforted him, cleaned him and his bedding, and attended to his physical care during the final critical hours of his life. During a good part of her involvement, though it was brief, a telephone call to involve a provider of conventional medical care would likely have led to the administration of insulin and would likely have saved Ian's life.

Lamb argues against finding a duty because advising medical treatment is antithetical to Christian Science nursing, which was what she was hired to provide. But in other situations Christian Scientists are instructed to cooperate with public officials—even when that cooperation runs contrary to Christian Science doctrine. Specifically,

**5.** Lamb's notes on the night of Ian Lundman's death indicate her knowledge of Ian's grave condition:

9:00 p.m.—Arrived. Boy had urinated—prepared bed—dad carried—light e.c. [evening care] p.c. [patient care] given—P[atient] had juice earlier—eyes rolled back—P[atient] awakened when moved—seemed aware of people—breathing labored.
10:10—siphoned water.
10:50—turned P[atient] onto R[ight side]—siphoned water.
11:15—Pract[itioner Tosto] called—report given—onto back.
11:30—P[atient] vomiting brownish fluid—called Pract[itioner]—vomiting ceased.
12:30—labored breathing.
12:50—moistened lips [with] Vaseline—P[atient] wet—p.c. [patient care] given.
1:00—P[atient] swallowing—facial spasms—called Pract[itioner]—report given.
1:05—immediate [change]—symptoms gone—labored breathing.
2:05—taking big breaths every other breath, gritting teeth.
2:10—called Pract[itioner]—report shallow, irregular breathing—eyes fixed.
2:20—called Pract[itioner]—P[atient] color white—passing possible.
2:36—P[atient] stopped breathing.
2:50—N[urse] called Pract[itioner].
3:02—husband called 911/M.E. [medical examiner] and C.O.P. [Van Horn].

Christian Scientists have been instructed, ever since founder Mary Baker Eddy wrote on the question, to promptly notify local health officials whenever they know or have reason to believe that an individual has a communicable disease and "the law so requires."

Indeed, one Christian Science manual can be read to imply that situations may arise where medical treatment may be required. Christian Science parents are warned of limitations on their right to impose Christian Science care on their children:

> The rights of Christian Scientists to select Christian Science treatment for their children in lieu of medical treatment will continue to be respected by public officials so long as [the officials] are assured that *effective* care is being given our children.

Christian Science Comm. on Publication for Minnesota, *Legal Rights and Obligations of Christian Scientists in Minnesota* 5 (1976) (emphasis added). Conversely, therefore, Christian Science parents are at least warned that their right to withhold conventional medical treatment is not absolute; parents are warned that when officials are not confident that effective care is being given, the right to select Christian Science treatment may end. That advice—or warning—logically extends beyond parents. Ian's situation was an instance where Christian Science professionals should have been aware of the requirement that they yield to the law of the community. We reject Lamb's argument that she had no professional duty except to persist in following pure Christian Science doctrine.

■ We also reject Lamb's argument that she is exempt from civil liability because the mother controlled what type of care Ian would receive. Lamb was alone with Ian from 1:00 until 2:00 a.m. while Kathleen McKown slept, and Lamb also held herself out as a professional Christian Science nurse with special training, skill, and experience in caring for others (albeit through Christian Science means). Regardless of who had ultimate authority in overseeing Ian's care, Lamb was obligated during her engagement to make Ian's welfare her paramount interest; she could not yield to a parent's di-

rections; protecting a child's life transcends any interest a parent may have in exercising religious beliefs. Furthermore, Lamb's argument fails because William and Kathleen McKown, too, were required to abandon the unlawful stance that Lamb now claims they imposed on her.

■ In the common law tradition, our holding today serves as notice to all professional Christian Science caregivers—be they practitioners, nurses, or others—that they cannot successfully disavow their professional duty to a child by deferring to the parent as the ultimate decision-making authority.

### 3. Mario Tosto

■ Appellant Mario Tosto, the practitioner hired by Kathleen McKown to pray for Ian, generally argues that he did not owe a duty to Ian beyond Christian Science prayer for Ian's recovery (something he did from his own home).

Again, we disagree, and affirm the trial court conclusion that Tosto owed a broader duty to Ian. Tosto, though he had no initial duty to Ian, accepted a responsibility to serve Ian and thereafter, through conversations with mother and nurse, held considerable power over Ian's welfare. Tosto was hired and paid $446 by the McKowns to play a professional and pivotal role in caring for Ian. The evidence indicates mother turned to Tosto for guidance throughout the final stage of Ian's illness. Tosto also assumed responsibility for Ian and was continuously in contact with the on-scene caregivers from day two (when he was hired) until the last moments before Ian's death, early on day four. Hence, Tosto accepted a professional's responsibility for Ian's health care. Tosto was compelled to make Ian's welfare his dominant interest.

■ We emphasize that the law required Tosto—as a trained Christian Science practitioner—to temper his use of Christian Science health care to conform his actions to the law of the community. Christian Science teachings direct him to follow the tenets of the religion, but, as a health-care provider, he is also required to yield to civil authority "when the law so requires."

Tosto argues that his control of Ian's care was subject to Kathleen McKown's ultimate authority. He argues that he was engaged by her only for Christian Science care, and that it runs counter to Christian Science teachings to acknowledge the need for medical care or to call for such care. But like Lamb, he could not hide behind mother. He had a responsibility on these facts to acknowledge that Christian Science care was not succeeding and to persuade mother to call in providers of conventional medicine or, persuasion failing, to override her and personally call for either a doctor or the authorities.[6]

### 4. James Van Horn

■ Appellant James Van Horn, the one-man Minnesota committee to protect Christian Science doctrines and practice from attack, argues that he did not have a special relationship because his only connection with Ian was his knowledge that Ian was ill. We agree and reverse the jury verdict and trial court holding that Van Horn had a legal duty toward Ian.

Although three telephone calls made Van Horn aware of Ian's illness, these calls were not sufficient, individually or cumulatively, to create a special relationship. Mother first called Van Horn on May 8—the day before Ian died—and reported that Ian was ill. The second call came later that day when William McKown called Van Horn for telephone numbers of state health officials. During the call, William McKown told Van Horn that he feared Ian might have an aggressive contagious disease, and that he wanted to alert public health officials. Finally, when Quinna Lamb arrived at the McKowns' home approximately five hours before Ian died, she called Van Horn.

The calls suggest that Van Horn may have been substantially aware of the seriousness of Ian's illness—as demonstrated by the fact that Van Horn himself contacted church officials in Boston to notify them of the case—

yet neither of the two definitions of a "special relationship" applies: Van Horn never accepted "power" over Ian's care, and he never assumed a responsibility to protect Ian. Rather, after learning that Kathleen and William McKown wanted Christian Science care, he asked that a professional be called (as Tosto was) to provide that care, demonstrating that he declined any personal obligation he might otherwise have assumed to provide that care.

Any duty he had ran to his employer, the church, not to Ian. As the Minnesota Committee on Publication, Van Horn generally had two distinct responsibilities: (1) assisting the national Committee on Publication in correcting "impositions" on or "injustices" to the Christian Science religion by media, and (2) consulting with Christian Scientists with respect to their legal rights and obligations. One Christian Science publication describes Van Horn's job as follows:

> [T]he Committees on Publication all over the world assist in protecting the rights of Christian Scientists under the laws of their states or countries against abridgments by persons exercising public authority, whether it be executive, judicial, or legislative, but in each case their efforts are directed toward the protection of the Cause of Christian Science.

Christian Science Comm. on Publication for Minnesota, *Legal Rights and Obligations of Christian Scientists in Minnesota* iv (1976). The position of the Committee on Publication does not include a duty of care toward individual Christian Scientists.

Further, Van Horn did not assume a duty to oversee the caregivers. And, unlike Mario Tosto, he was neither in steady contact with the on-scene caregivers nor hired to pray for Ian.[7] Mere knowledge of an illness, without either an assumed obligation of care or prior relationship, is insufficient to create a special relationship. We accordingly reverse the trial court's decision that Van Horn had a duty

---

6. Pursuant to Minn.Stat. § 260.165, subd. 1 (1992), a child may be taken into immediate custody by court order or by a peace officer that finds a child in a situation which the "officer reasonably believes will endanger the child's health or welfare."

7. See Lamb's notes, reproduced *supra* note 5, for a comparison of Tosto's role during the last hours of Ian's life.

toward Ian. To base duty on mere knowledge coupled with power would implicate neighbors, grandparents, and friends.

We note the compelling temptation to hold Van Horn liable solely on the ground that he *could have* suggested medical treatment at any time (especially during one of the three telephone calls made to him), and that if he had suggested medical care to the McKowns or Lamb his advice would likely have been heeded.

But the imposition of negligence liability must be preceded by a legal duty; the fact that Van Horn failed to suggest medical care is irrelevant unless it is first established that he had a duty to suggest that care. To impose a duty solely because Van Horn could have (with effect) suggested medical care reduces the question of negligence into a "but for" causation test: whether or not Van Horn held Ian's life in his hands. The Minnesota Supreme Court has rejected this reasoning, however, as something that "distorts the basic tort concept of duty." *Harpster v. Hetherington,* 512 N.W.2d 585, 586 (Minn.1994). We observe again that the "but for" test would implicate neighbors and friends.

### 5. Clifton House

■ Respondent argues that appellant Clifton House, Inc., a nonprofit corporation that operates a Christian Science nursing facility accredited by the First Church, assumed a duty to care for Ian because (1) it rendered "advice over the telephone in [a] medical setting," and (2) the jury found that Clifton House "sent" Quinna Lamb, who acted as its agent, to care for Ian. We disagree and reverse because the evidence is insufficient to support the jury's finding of agency; hence the trial court's conclusion that Clifton House assumed a duty toward Ian also fails.

The facts present an insufficient basis for a duty of care. Several telephone calls were made to the nursing home in connection with Ian's illness, but the nursing home never assumed "considerable power" over Ian's welfare. And there is no evidence that the nursing home accepted any professional responsibility to serve Ian; it simply—without compensation—provided suggestions for

care, in contrast to Lamb and Tosto, the professionals who were hired to actually care for Ian on an on-going basis.

Respondent, to support his argument that Clifton House assumed a duty by providing free nutritional advice over the phone, cites *Grondahl v. Bulluck,* 318 N.W.2d 240 (Minn. 1982). But *Grondahl* does not discuss whether a duty is assumed or a special relationship is created based on telephone calls for health care advice; *Grondahl,* rather, concerned only a statute-of-limitations issue in a medical malpractice case involving a long-established physician-patient relationship where the physician used the telephone to communicate with his patient (though not in accord with professional standards). *Id.* at 241–42.

■ Respondent also argues that Clifton House owed a duty to Ian because the jury found that Clifton House had sent Lamb—as its agent—to care for Ian. But the jury's finding of a principal-agent relationship between Clifton House and Lamb is without evidentiary support and is erroneous as a matter of law.

■ Whether an agency relationship exists is generally a question for the jury, unless the evidence is conclusive. *See PMH Properties v. Nichols,* 263 N.W.2d 799, 802 (Minn.1978) (existence of agency is question of fact). Here, by special verdict the jury found that an agency existed between Clifton House and Lamb. On review of a special verdict, the answers to a question will not be set aside unless they are

> perverse and palpably contrary to the evidence or where the evidence is so clear [as] to leave no room for differences among reasonable people. The evidence must be viewed in a light most favorable to the jury verdict. If the jury's special verdict finding can be reconciled on any theory, the verdict will not be disturbed.

*Hanks v. Hubbard Broadcasting, Inc.,* 493 N.W.2d 302, 309 (Minn.App.1992) (citations omitted), *pet. for rev. denied* (Minn. Feb. 12, 1993).

The jury finding of an agency relationship between Lamb and Clifton House is perverse

and contrary to the evidence because Clifton House did not have a right to control Lamb's actions. *See Jurek v. Thompson,* 308 Minn. 191, 198, 241 N.W.2d 788, 791 (1976) (rejecting jury's finding of agency where evidence of "defendant's right of control * * * is totally lacking") (citing Restatement (Second) of Agency § 1, cmt. b).

Even if, as the jury apparently believed, Clifton House "sent" Lamb, it is also clear that Lamb was free to decline the referral; Lamb called the McKowns herself and after she was engaged there were no further communications between Clifton House and either the McKowns or Lamb. The agency theory fails because there is no evidence that Clifton House made a "manifestation" that Lamb was acting on its behalf; nor is there any evidence that Clifton House had the right to control Lamb's actions or conduct. *See PMH Properties,* 263 N.W.2d at 802 (agency requires both manifestation by principal that agent is acting on its behalf, and a right of principal to control agent).

Finally, the nursing home had no financial relationship relating to Ian's care (the McKowns paid Lamb $79 for her services directly, not through Clifton House). We reverse the trial court's conclusion that Clifton House assumed a duty toward Ian.

### 6. First Church

■ Following special jury verdicts that Tosto and Lamb were "agents of the church," and that their acts were "authorized by the church," the trial court ruled that the church, as principal, owed a duty toward Ian.[8]

As the church concedes, its Christian Science publications certainly "inspired Kathy to care for Ian as she did." But there is no evidence supporting a finding that the church acted as principal to Tosto or Lamb—there was never any agreement between them that manifested either consent or a right of control. *See Jurek,* 241 N.W.2d at 793 (agency requires persuasive evidence of affirmative

manifestation of control or fiduciary relationship).

Respondent asserts that the jury properly found that the church's agency relationship arises from listing Tosto and Lamb in a Christian Science publication—that this listing was a "certification" by First Church that the individual had met the church's requirements to qualify as nurse and practitioner (listing is limited to approved nurses and practitioners). But we decline to affirm a jury's finding of agency based purely on advertisements in a journal published by the alleged principal, even if advertisers are screened. "Seals of approval" do not create agencies.

There simply was no evidence that the church had a right to *control* the means and manner of Tosto's and Lamb's performances in caring for Ian beyond that approved advertisement and the control derived from their acceptance of the religious doctrine espoused by the church.

> The law is clear that an agency relationship does not exist unless there are facts showing that the alleged principal had the right to control the agent's conduct *in performing the services.*

*Vieths v. Ripley,* 295 N.W.2d 659, 664 (Minn. 1980) (emphasis added). We hold, therefore, that the jury could not lawfully find that First Church was a principal in an agency relationship relating to Ian's care; the trial court erred in imputing a duty of care to the church. To rule otherwise would make too much of the consequences of the church's adherence to and promotion of its core tenet.

■ Like the temptation to hold Van Horn liable because he *could have* suggested medical treatment—and saved Ian's life—there is a temptation to hold the church liable on the ground that it could have instructed its Christian Science nurses, practitioners, and followers to suggest medical care when the life of a child is threatened by continued reliance on spiritual care. But, again, that is putting the cart before the

---

8. The jury also found that Van Horn was an "agent of the church," and that the church, as Van Horn's principal, owed a duty toward Ian. Van Horn's acts may have been "authorized by the church," but, because we hold that Van Horn never held a special relationship with Ian, the alleged agency relationship between Van Horn and the First Church does not provide a sufficient basis to hold that the church had a duty of care toward Ian.

horse; mere power is not sufficient for the imposition of a duty. And duty is a prerequisite to a finding of negligence.

 Finally, a church is not a lawn-mower manufacturer that can be found negligent in a products liability case for failing to affix a warning sticker near the blades. As previously noted, the constitutional right to religious freedom includes the authority of churches—not courts—to independently decide matters of faith and doctrine, and for a church as an institution to believe and speak what it will. When it comes to restraining religious *conduct*, it is the obligation of the state, not a church and its agents, to impose and communicate the necessary limitations—to attach the warning sticker. A church always remains free to espouse whatever *religious belief* it chooses; it is the *practices of its adherents* that may be subject to state sanctions.

Again, even bearing in mind that the jury's finding of an agency relationship must be affirmed unless it is "perverse and palpably contrary to the evidence," we reverse the finding that the First Church assumed a duty to care for Ian based on the role of its purported agents.

## B. Standard of Care

 The second element of negligence challenged by appellants is whether the individual defendants breached their respective duties of care. We examine this question only in relation to the appellants who had a duty of care.

Those appellants first assert that two statutes found relevant in deciding *McKown I*— Minn.Stat. §§ 609.378 (1988) and 626.556 (Supp.1989)—"officially authorize" spiritual treatment "in all circumstances." Appellants also rely on the unpublished holding of the Michigan Court of Appeals in *Brown v. Laitner*, No. 73903 (Mich.Ct.App. Dec. 17, 1986).

But *Brown* does not discuss the relevant standard of care for Christian Science caregivers. And neither statute at issue in *McKown I* suggests a standard of care to be followed. *See Valtakis v. Putnam*, 504 N.W.2d 264, 266–67 (Minn.App.1993) (Minn. Stat. § 626.556 does not establish civil standard of care).[9]

Even if one of the statutes established a standard of care, that standard would not necessarily apply to this negligence action. *See Blasing v. P.R.L. Hardenbergh Co.*, 303 Minn. 41, 49, 226 N.W.2d 110, 115 (1975) ("[T]he fact that a person * * * has complied with a statute or ordinance regulating conduct under the circumstances is not conclusive that he was in the exercise of due care."). We note again that the relevance of these statutes in *McKown I* arose from the due process *notice* issue, not from a determination that either statute ratified reliance on Christian Science treatment during Ian's final illness.

---

9. Minn.Stat. § 609.378, subd. 1 (1988), provides in relevant part:

> A parent, legal guardian, or caretaker who willfully deprives a child of necessary food, clothing, shelter, health care, or supervision appropriate to the child's age, when the parent, guardian, or caretaker is reasonably able to make the necessary provisions and which deprivation substantially harms the child's physical or emotional health * * * is guilty of neglect of a child. * * * If a parent, guardian, or caretaker responsible for the child's care in good faith selects and depends upon spiritual means or prayer for treatment or care of disease or remedial care of the child, this treatment or care is "health care" as used in [this] clause.

The relevant part of Minn.Stat. 626.556, subd. 2(c) (Supp.1989), provides:

> "Neglect" means failure * * * to supply a child with necessary food, clothing, shelter or medical care * * * or failure to protect a child from conditions or actions which imminently and seriously endanger the child's physical or mental health. * * * Nothing in this section shall be construed to mean that a child is neglected solely because the child's parent, guardian, or other person responsible for the child's care in good faith selects and depends upon spiritual means or prayer for treatment or care of disease or remedial care of the child in lieu of medical care; except that there is a duty to report if a lack of medical care may cause imminent and serious danger to the child's health. This section does not impose upon persons, not otherwise legally responsible for providing a child with necessary food, clothing, shelter, or medical care, a duty to provide that care.

We reject appellants' argument that the standard of care here is derived from either section 609.378 or section 626.556.

■ Tosto and Lamb also argue that, if a statutory standard does not apply, then the proper standard is that of a "reasonable Christian Science professional." They argue that the trial court erred as a matter of law in applying the "reasonable person" standard of care. Tosto and Lamb first cite *Baumgartner v. First Church of Christ, Scientist*, 141 Ill.App.3d 898, 96 Ill.Dec. 114, 490 N.E.2d 1319 (1986), *appeal denied* (Ill. June 3, 1986), *cert. denied*, 479 U.S. 915, 107 S.Ct. 317, 93 L.Ed.2d 290 (1986). But *Baumgartner* concerned an *adult* decedent who chose to undergo Christian Science treatment, while Ian was an 11–year–old child. The *Baumgartner* court based its decision on Illinois case law that gives *competent adults* the constitutional right "to refuse medical treatment when it conflicts with * * * religious beliefs." *Id.*, 96 Ill.Dec. at 121, 490 N.E.2d at 1326.

Appellants also point to text in *Baumgartner* regarding what standard of care applied to a Christian Science practitioner in adjudicating a medical malpractice claim. But this is not a malpractice claim. And here, in contrast to *Baumgartner*, we must take account of a public-duty limitation on the reasonable Christian Science practitioner, a limitation that arises from concern for a child.

Lamb and Tosto also cite *Spead v. Tomlinson*, 73 N.H. 46, 59 A. 376 (N.H.1904), in support of applying a "reasonable Christian Science professional" standard. In *Spead*, the plaintiff sued a Christian Scientist "healer" who failed to cure her appendicitis, claiming negligence and deceit. *Id.*, 59 A. at 377. The New Hampshire Supreme Court held that the standard of care was that "of the ordinary Christian Scientist who undertakes to treat diseases according to the methods practiced by such healers." *Id.*

But *Spead*, like *Baumgartner*, involves an adult plaintiff who specifically contracted with a Christian Scientist caregiver—knowing that the treatment was to be different from ordinary medical care. *Id.*, 59 A. at 378. Here, in contrast, Ian, a child, never contracted with the Christian Scientist prac-

titioners. The following passage in *Spead* is particularly relevant:

> Had [the plaintiff] been an infant, non compos, or had never assented to Christian Science treatment, then the question [of] whether the practice of Christian Science * * * is so contrary to common sense and reason that it would be negligent * * * might be open to consideration by a jury. But being a person of mature years, and having sought such treatment, she cannot now complain.

*Id.* Accordingly, the cases cited to support appellants' argument for the imposition of a "pure" Christian Scientist standard of care are not persuasive.

We nonetheless agree with appellants that to apply the standard of care of a reasonable person, while not taking account of religious belief, is inappropriate under the facts presented. Our conclusion is based on our recognition that an individual's right to religious autonomy is a core ideal of both the state and federal constitutions; we must defend the right of any citizen to hold whatever religious beliefs he or she may choose. This is especially true where, as here, the undisputed facts demonstrate that appellants genuinely believed that Christian Science care was appropriate in treating Ian.

But appellants' *personal* rights to freely practice religion are not the only rights to be considered. It is crucial to distinguish between an adult's right to practice religion by refusing medical treatment for his or her *own* illness and the right to practice religion by refusing to seek or provide medical treatment for *another* person—especially when the other person is a child. As stated by the United States Supreme Court in *Prince v. Massachusetts*, 321 U.S. 158, 170, 64 S.Ct. 438, 444, 88 L.Ed. 645 (1944):

> Parents may be free to become martyrs themselves. But it does not follow they are free, in identical circumstances, to make martyrs of their children before they have reached the age of full and legal discretion when they can make that choice for themselves.

Although *Prince* did not involve the use of spiritual prayer to care for a child (it con-

cerned the use of a nine-year-old girl to sell religious magazines in violation of child labor laws), its reasoning applies, and its language is hauntingly relevant.

█ To grant appellants an outright exemption from negligence liability based on their religious beliefs would insulate Christian Scientists from tort liability in cases involving children; we will not embrace a negligence standard that would ignore the rights of Ian Lundman. The right to hold one's own religious beliefs cannot include the right to persist to act in conformity with those beliefs to the point of imminent danger to a child. So, though we apply a standard of care taking account of "good-faith Christian Scientist" beliefs, rather than an unqualified "reasonable person standard," we hold that reasonable Christian Science care is circumscribed by an obligation to take the state's (and child's) side in the tension between the child's welfare and the parents' freedom to rely on spiritual care.

█ A parent may exercise genuinely held religious beliefs. But the resulting conduct, though motivated by religious belief, must yield when—judged by accepted medical practice—it jeopardizes the life of a child. Religious practices must bend to the state's interest in protecting the welfare of a child whenever the child might die without the intervention of conventional medicine.

We note that this circumscribed qualification on the reasonable person standard of care is easier stated than applied; slippery-slope concerns arise. Questions will be raised regarding the age at which a child may free others of responsibility to turn to conventional medicine, how ill a child must be before conventional medicine must be called on, how to deal with serious but less than life-threatening illness, and how to deal with an adult deprived of the capacity to choose. We decline to draw any bright-line rules. Our decision is based on the specific facts presented in this case (and generally undisputed by the parties): that the patient was a child, and that the defendants had a genuine, good-faith belief in their religion. Under these facts, a reasonable person—who is a good-faith Christian Scientist—standard of care applies to appellants' actions in caring

for Ian. But under that standard, when the Christian Scientist appellants were put to a choice between fidelity to religious belief or serious injury and potential death to the child—judged by the law's general acceptance of conventional medicine—the child's right to life prevails.

## C. Breach and Causation

█ We next examine whether the evidence demonstrates that appellants failed to follow the reasonable person standard of care where the accommodation to their Christian Scientist beliefs is circumscribed by the limitation described above. This is normally a question for the jury. *Steffey v. Soo Line R.R.*, 498 N.W.2d 304, 308 (Minn.App.1993), *pet. for rev. denied* (Minn. May 28, 1993).

Here, the jury, applying the ordinary reasonable person standard of care, found that Kathleen and William McKown, Mario Tosto, and Quinna Lamb failed to act reasonably in caring for Ian, and that their breaches of duty caused Ian's death. But, as demonstrated above, the proper standard of care must take account of the appellants' reasonable Christian Scientist beliefs.

Typically, a remand would be required to allow the trier-of-fact to determine whether the individuals breached this more precisely described standard of care and to determine causation. But a remand is not necessary where, as here, the undisputed facts demonstrate as a matter of law that appellants breached the standard of care of a *reasonable* Christian Scientist, a standard that on these facts required a turn to conventional medicine, and that their negligence caused Ian's death. *See Steffey*, 498 N.W.2d at 308 (question of negligence not for jury where facts undisputed and finder-of-fact could reach only one conclusion).

The undisputed facts show that Ian's caregivers failed to seek medical help in the three days leading to his death, despite continuous and dramatic indications that Ian was ill with a life-threatening disease—first seriously, then gravely—and that he would die, given continued reliance on Christian Science prayer. The undisputed facts indicate that appel-

lants had no lawful choice but to seek medical help.

We hold as a matter of law, therefore, that the four duty-bound defendants breached the standard of care for a reasonable Christian Scientist, who was obligated—with knowledge of a child's grave illness—to seek the assistance of conventional medicine. Further, their separate breaches of duty proximately caused Ian's death.

## IV.

## TRIAL ERRORS

Appellants argue that the trial court committed material errors in ruling on evidentiary matters, failing to remedy prejudicial closing argument, and instructing the jury. Appellants argue that the separate and cumulative effect of the errors deprived them of a fair trial.

### A. Evidentiary and Other Trial Errors

■ Rulings on evidentiary matters and the conduct of trial are left to the discretion of the trial court and will not be reversed absent an abuse of discretion. *Jenson v. Touche Ross & Co.*, 335 N.W.2d 720, 725 (Minn.1983). Further, a new trial will be granted only if the errors resulted in prejudice to the complaining party. *Ramfjord v. Sullivan*, 301 Minn. 238, 251, 222 N.W.2d 541, 549 (1974).

#### 1. Privilege

Appellants first argue that the trial court improperly allowed Lundman to testify over Kathleen McKown's marital-privilege objection, and to permit Lundman to call Kathleen and William McKown as witnesses.

■ A party spouse may assert the marital privilege to bar a witness spouse from testifying. Minn.Stat. § 595.02, subd. 1(a) (1992). But the privilege should be narrowly construed so as not to interfere with the process of determining truth. *State v. Hannuksela*, 452 N.W.2d 668, 676 (Minn. 1990). And in each instance, courts should determine the validity of the privilege by considering whether the testimony will actually be adverse. *United States v. Smith*, 742

F.2d 398, 401 (8th Cir.1984) (denying marital privilege where questions posed to defendant wife were not adverse to defendant husband). The testimony here was in no instance adverse to the non-testifying spouse; the trial court did not abuse its discretion in allowing non-adverse spousal testimony.

■ Appellants also argue that the trial court violated the clergy privilege by permitting practitioner Tosto to be examined about his conversations with Kathleen McKown and Ian. Minnesota law prevents a member of the clergy from being examined as to any communication made "by any person seeking religious or spiritual advice, aid, or comfort" without the person's consent. Minn.Stat. § 595.02, subd. 1(c) (1992). But the only testimony objected to here concerned why Tosto did not pray for Ian in Ian's presence. The privilege does not apply here because there was no question asked regarding a communication. *See State v. Black*, 291 N.W.2d 208, 216 (Minn.1980) (implicit requirement of clergy privilege is that *communications* were made with expectation that they would be confidential).

#### 2. Postmortem Photographs

■ Appellants challenge the admission of postmortem photographs of Ian, arguing they are unfairly prejudicial. But the mere fact the photographs are graphic is not an adequate reason to exclude them from trial. *State v. Sullivan*, 502 N.W.2d 200, 202 (Minn.1993). Respondent also contends the photographs were admitted without adequate foundation. But proper foundation was based on a police officer's testimony that the photographs accurately depicted how Ian looked minutes after he arrived on the scene, and based also on the testimony of Dr. Donnell Etzeiler that the photographs reflected how a child with juvenile-onset diabetes would appear.

#### 3. Depression Medication

■ The next of kin of a decedent in a wrongful death case may not recover for emotional distress or suffering. *Fussner v. Andert*, 261 Minn. 347, 359, 113 N.W.2d 355, 363 (1961). Appellants, therefore, argue that the trial court erred by permitting testimony

that respondent was taking medication for depression. But the trial court did not abuse its discretion in admitting testimony offered for a proper purpose—to explain respondent's inconsistent pretrial and trial testimony. Furthermore, the prejudicial effect of the testimony, if any, was mitigated by the trial court's explicit instruction to the jury not to award any damages for emotional distress.

### 4. Van Horn's Letter to County Attorney

▮ Appellants argue that the trial court erred by not allowing them to enter rebuttal evidence to a letter that Van Horn had written to the Hennepin County attorney. Appellants argue that admission of this letter "opened the door" for them to introduce further evidence regarding the criminal proceedings in *McKown I.* Appellants cite *Busch v. Busch Constr., Inc.,* 262 N.W.2d 377 (Minn.1977), which involves the doctrine of curative admissibility. This doctrine permits otherwise inadmissible evidence to be admitted where an opponent has " 'opened the door' by introducing similarly inadmissible evidence on the same point." *Id.* at 386. If the original evidence is "admissible or non-prejudicial," then the trial court has discretion on whether to admit related evidence on a "curative admission" basis. *Id.*

Here, the trial court did not abuse its discretion in excluding the evidence because the court—at appellants' request—had redacted portions of the letter before allowing it into evidence, which made the letter both admissible and non-prejudicial.

### 5. Handwritten Notes

▮ Appellants argue that the trial court improperly excluded respondent's handwritten notes from an unrelated prior custody proceeding, which allegedly show that Lundman knew (before Ian's illness) that Kathleen McKown would use Christian Science care if Ian ever became ill. Appellants sought to admit the notes to attack respondent's credibility.

But the trial court properly excluded this evidence on the ground that its admission would violate respondent's attorney-client privilege and that it had been inadvertently disclosed to appellants.

### 6. Religious Documents and Testimony

▮ Appellants argue that the trial court improperly admitted witness testimony regarding religious documents and policies, and that the evidence incited the jury against the Christian Science religion and inflated the damage award.

But allowing respondent's inquiry into Christian Science documents and policies was not error because appellants themselves first introduced testimony and exhibits on the subject. *See Peterson v. Sorlien,* 299 N.W.2d 123, 130 (Minn.1980) (allowing defendant to introduce relevant evidence regarding plaintiff's religious association after plaintiff had voluntarily placed matter in issue), *cert. denied,* 450 U.S. 1031, 101 S.Ct. 1742, 68 L.Ed.2d 227 (1981). Appellants carried Bibles while testifying. They put into evidence the Holy Bible, the church manual, copies of *Science and Health,* and writings of Mary Baker Eddy. Appellants offered expert testimony on their beliefs and testified on the philosophical underpinnings of their reliance on prayer healing.

Furthermore, we agree with respondent that some basic understanding of Christian Science health care was necessary. *See id.* at 129–30 (permitting evidence regarding religious beliefs despite inherent danger of religious bias).

### 7. Ian's Choice

▮ Appellants argue that the trial court erroneously permitted irrelevant evidence and argument on whether they gave Ian a choice regarding his health care. They argue that the testimony was inflammatory and irrelevant.

But testimony regarding Ian's choice was relevant to distinguish this case from others where an individual freely chose to undergo Christian Science treatment. *Cf. Baumgartner,* 490 N.E.2d at 1326 (concerning rights of competent adults to choose to refuse medical treatment). Further, the evidence was at least partially relevant as an indicator of the reasonableness of appellants' conduct; the

record contains evidence that church policy prefers proof that a patient actually chose to forego medical treatment.

### 8. Liability Insurance

■ Appellants argue that respondent improperly elicited testimony that Clifton House had purchased liability insurance for its employees. The testimony was admitted when a witness, questioned as to why he believed Clifton House could be defined as a "health care provider," testified that Clifton House had liability insurance for its employees.[10]

The testimony was not prejudicial because it was part of a narrative answer covering many things that placed no emphasis on the item. Furthermore, the information had already been admitted into evidence via the Clifton House Employee Manual, which states that Clifton House provides its employees with liability insurance. *See Wilson v. Home Gas Co.,* 267 Minn. 162, 168, 125 N.W.2d 725, 729 (1964) ("[T]he existence of insurance * * *, if it becomes relevant to prove or rebut an issue arising in the trial of the case, * * * may be admissible even though it is prejudicial."); *Sander v. Dieseth,* 230 Minn. 125, 127, 40 N.W.2d 844, 845 (1950) (jury's knowledge of insurance not necessarily prejudicial because average citizen knows it already).

### B. Closing Argument

■ Appellants argue that the trial court permitted improper closing argument that "belittled" their religious convictions.

Whether remarks made in final argument require a cautionary instruction for misconduct of counsel rests largely in the trial court's discretion, and the appellate court should not reverse its determination unless the conduct is so prejudicial that it would be a miscarriage of justice to permit the result to stand.

*Robinson v. Mack Trucks, Inc.,* 426 N.W.2d 220, 227 (Minn.App.1988), *pet. for rev. denied* (Minn. Sept. 28, 1988). To be reversible error, the remarks must clearly influence the verdict. *Thomson v. Boles,* 123 F.2d 487, 495 (8th Cir.1941), *cert. denied,* 315 U.S. 804, 62 S.Ct. 632, 86 L.Ed. 1204 (1942). Having reviewed the transcript, we conclude the trial court did not err in holding that respondent's closing argument was not so egregious as to require a new trial.

### C. Jury instructions

■ Trial courts are allowed considerable latitude in selecting the language in jury instructions. *Alholm v. Wilt,* 394 N.W.2d 488, 490 (Minn.1986). An appellate court will not reverse a district court's decision unless the instructions constituted an abuse of discretion. *Id.*

Appellants first argue that the trial court erred as a matter of law in instructing the jury that Minn.Stat. §§ 609.378 and 626.556 were not to be considered in determining negligence. Appellants generally argue that "informed compliance" with the statutes may constitute due care. We disagree. The instruction was a correct statement of the law.[11] Furthermore, the instruction was not prejudicial because the court so instructed the jury only after appellants' counsel had violated previous rulings that the statutes did not establish the applicable standard of care (and should go unmentioned).

Appellants also argue that the trial court erred in withdrawing an affidavit from evidence and instructing the jury to disregard it. The affidavit was written by Ian's 17–year–old sister, Whitney Lundman. In it she disclaims her right to recovery from the wrongful death action.

■ The withdrawal of evidence is discretionary with the trial court and is allowed where the evidence is irrelevant and immaterial. *Mettling v. Mulligan,* 303 Minn. 8, 16,

---

10. We also note that appellants' argument fails based on our decision today that Clifton House did not have a duty to Ian.

11. The trial court instructed the jury:
There has been reference through this case to several criminal statutes, including the child neglect and reporting statutes. These statutes do not establish the standard for negligence in this case. These statutes shall not be considered by you in determining whether any one party is negligent in this case.

225 N.W.2d 825, 830 (1975) (quoting *Maas v. Midway Chevrolet Co.*, 219 Minn. 461, 464, 18 N.W.2d 233, 235 (1945)). Here, the trial court properly withdrew the affidavit from evidence and properly gave an instruction concerning it because it was inadmissible from the start.

## V.

### REMITTITUR

We turn now to respondent's claimed error.[12] Respondent argues that the trial court erred in granting remittitur on the compensatory damages because adequate evidence supported the jury's verdict.

The decision whether to grant a remittitur is within the trial court's sound discretion. *Bigham v. J.C. Penney Co.*, 268 N.W.2d 892, 898 (Minn.1978). When the trial court grants remittitur and gives its reasons, an appellate court is unlikely to tamper with that determination. *Sorenson v. Kruse*, 293 N.W.2d 56, 63 (Minn.1980). The trial court here granted remittitur on the ground that the $5.2 million award was excessive under the facts presented at trial. The trial court did not abuse its sound discretion.

Appellants, on the other hand, argue that the award of $1.5 million in compensatory damages is improper because Minnesota courts have previously not awarded more than $1 million for the death of a child. But, on this question, past cases represent history, not controlling law. At one time, the highest recovery was a few thousand dollars.

Appellants also argue there was only "weak" evidence regarding respondent's loss of companionship, and that the trial court failed to address facts regarding his late child support payments. But there is evidence supporting the trial court's findings that Lundman was a "very loving father" and that he had followed Ian's growth in "great detail." The evidence also supports the finding that Whitney Lundman had a close, loving relationship with Ian. Hence, the award of $1.5 million was not an abuse of discretion.

## DECISION

The trial court erred in denying the First Church of Christ Scientist's motion for J.N.O.V. or remittitur of the punitive damage award; that award was unconstitutional. The trial court erred in denying motions for J.N.O.V. made by appellants James Van Horn, Clifton House, and the First Church of Christ, Scientist; they had no duty to Ian. The court properly granted appellants' motions for remittitur of the compensatory damage award from $5.2 million to $1.5 million. Appellants' alternative motions for a new trial were properly denied. Judgment in the amount of $1.5 million against Kathleen McKown, William McKown, Quinna Lamb, and Mario Tosto is affirmed.

**Affirmed in part and reversed in part.**

KLAPHAKE, Judge (concurring in part, dissenting in part).

I concur with the majority's reversal of the punitive damages award, and the compensatory award against Clifton House, and the affirmance of the compensatory award against Kathleen McKown, William McKown, Quinna Lamb, and Mario Tosto. I write separately, however, because (1) James Van Horn assumed a duty of care towards Ian, and (2) the jury finding of an agency relationship between the First Church in Boston and appellants is not perverse and palpably contrary to the evidence. Accordingly, I would also hold James Van Horn and the First Church liable for compensatory damages.

---

12. In an earlier order we deferred decision on respondent's motion to strike. Respondent first argues that appellant First Church of Christ, Scientist, improperly placed a section entitled, "A Brief View of Christian Science" in its statement of the case. We agree and strike that portion of the First Church Brief. *See* Minn.Civ. App.R. 128.03 ("Whenever a reference is made in the briefs to a part of the record[,] * * * the reference shall be made to the particular part of the record, suitably designated, and to the specific pages of it."). Respondent also argues that appellants improperly included four items in their joint appendix. We deny this motion because each of the four items is contained in the trial court record. *See* Minn.R.Civ.App.P. 110.01 (record on appeal consists of papers filed in trial court, exhibits, and transcript of proceedings).

### 1. *Van Horn*

The existence of a duty is a question of law. *Carlson v. Mutual Service Ins.,* 494 N.W.2d 885, 887 (Minn.1993). Generally, there is no duty to aid another, unless the defendant stands in a "special relationship" with a foreseeable plaintiff. *Harper v. Herman,* 499 N.W.2d 472, 474 (Minn.1993); *Wood v. Astleford,* 412 N.W.2d 753, 755 (Minn.App.1987), *pet. for rev. denied* (Minn. Nov. 24, 1987). A special relationship exists where: (1) one party has custody of another under circumstances that deprive the other person of normal opportunities of self-protection, *Harper,* 499 N.W.2d at 474 (citing Restatement (Second) of Torts § 314A (1965)); or (2) one party gratuitously accepts the responsibility of acting to protect another, even though there was no initial duty to protect another. *Walsh v. Pagra Air Taxi, Inc.* 282 N.W.2d 567, 570–71 (Minn.1979).

Appellant James Van Horn was the one-person Committee on Publications (CoP) who implemented First Church policy on healing for the State of Minnesota. The First Church Board of Directors in Boston supervised him in his duties, which included advising Christian Scientists on their healing actions. First Church written policies required him to directly interact with parents, nurses, practitioners, and other caregivers of seriously ill children.

The trial court found that Van Horn assumed a duty of care toward Ian based in part on his "considerable power over Ian's welfare." The majority reverses on the ground that no special relationship arises solely from the fact that Van Horn knew that a child was ill. But the majority's account of Van Horn's role in providing care fails to acknowledge his direct control over both Ian's care and the people administering that care.

Van Horn had conversations with William McKown, Kathleen McKown, and Quinna Lamb, the journal-listed nurse, regarding Ian's condition, and he himself called the First Church officials in Boston regarding Ian's condition. Each of these conversations amounted to much more than a simple relaying of facts that Ian was ill.

Van Horn spoke with Kathleen McKown when she first believed that her son's life was in danger. Because First Church policy requires that the CoP be contacted when a child is seriously ill and not improving, Van Horn knew from day one that Ian's condition was poor and potentially life threatening. In that initial call, Van Horn verified that Kathleen McKown had retained a journal-listed Christian Science Practitioner pursuant to First Church policy. Second, Van Horn called his boss, the National CoP, and discussed the fact that Ian was seriously ill and not improving. Van Horn was contacted a third time that same day when William McKown called to tell him that Ian was possibly suffering from an "aggressive" contagious disease. Pursuant to First Church policy regarding a child's failing health, in that conversation, Van Horn provided William McKown with telephone numbers of local health officials. Finally, when Quinna Lamb arrived to provide Christian Science nursing care, she immediately called Van Horn to report her presence.

These facts support the trial court's legal conclusion that Van Horn assumed a duty to Ian based on a special relationship. Van Horn "gratuitously accepted" the responsibility to protect Ian through his constant contact with Ian's caregivers as they tended to his failing health, and he received continuous updates on Ian's failing condition. Although others directly provided Ian's care, they relied on Van Horn's continuous advice about the options according to First Church policy. There is evidence in the record that the CoP is instructed to tell parents who contact him regarding their seriously-ill children that "[w]hile care must be taken to cooperate with officials, only information necessary to allay any suspicion or fear that the child is not being adequately cared for should be given." By acting consistently with this instruction, Van Horn insulated Ian from public intervention which may have saved his life. This evidence provides a sufficient basis from which the trier-of-fact could have reasonably inferred that Van Horn assumed a duty of care toward Ian. This is not a case of duty arising from simple knowledge of an illness.

### 2. The First Church

The majority also declines to find that the First Church assumed a duty toward Ian on the ground that the jury finding of agency is contrary to the evidence. Again, I disagree.

Whether an agency relationship exists is generally a question for the jury unless the evidence is conclusive. *PMH Properties v. Nichols,* 263 N.W.2d 799 (Minn.1978). Here, the jury found by special verdict that Van Horn, Tosto, and Lamb were agents for the First Church. On review of a special verdict, the answers to the questions will not be set aside:

> [U]nless they are perverse and palpably contrary to the evidence or where the evidence is so clear to leave no room for differences among reasonable people. The evidence must be viewed in a light most favorable to the jury verdict. If the jury's special verdict finding can be reconciled on any theory, the verdict will not be disturbed.

*Hanks v. Hubbard Broadcasting, Inc.,* 493 N.W.2d 302, 309 (Minn.App.1992) (citations omitted), *pet. for rev. denied* (Minn. Feb. 12, 1993).

Viewing the evidence in a light most favorable to the jury verdict that an agency relationship existed, the jury's finding of agency is not perverse or contrary to the evidence. There was evidence in the record of an agency relationship founded on the First Church's listing of Tosto and Lamb in the Christian Science Journal. The First Church certified through this list that Lamb and Tosto met the First Church's "stringent" requirements to qualify as a nurse or practitioner. Further, the evidence suggests that a Journal listing demonstrated the "love, strength and support of the Mother Church" for each individual. Hence, the jury could reasonably find an agency relationship.

The majority holds that there was no agency relationship because the First Church had no control over Lamb or Tosto's actions. *See Jurek v. Thompson,* 308 Minn. 191, 198–99, 241 N.W.2d 788, 791 (rejecting the jury's finding of agency where "defendant's right of control * * * is totally lacking") (citing Restatement, Agency 2d, § 1, comment b). But it is clear that the First Church installed Lamb and Tosto as a Christian Science nurse and practitioner, and had the power to remove them from the Journal list for failure to follow church tenets. The First Church's removal of names from the Journal list would have ended Lamb and Tosto's careers as Christian Science nurse and practitioner. Under these facts, the jury could reasonably find that the First Church had control over them.