[No. G016980. Fourth Dist., Div. Three. June 30, 1998.]

GAYLE QUIGLEY, Plaintiff and Appellant, v.
FIRST CHURCH OF CHRIST, SCIENTIST et al., Defendants and
Respondents.

[No. G017471. Fourth Dist., Div. Three. June 30, 1998.]

GAYLE QUIGLEY, Plaintiff and Appellant, v.
RUTH WANTLAND, Defendant and Respondent.

## COUNSEL

Nichols, Kaster & Anderson, James H. Kaster, Paul L. Lukas, Cummins & White, James R. Wakefield and Bradley V. Black for Plaintiff and Appellant.

Dryden, Margoles, Schimaneck, Hartman, Kelly & Wait, Shawn E. McMenomy, Gibson, Dunn & Crutcher, John H. Sharer, Charles S. Battles, Jr., and Bradley E. Pomerance for Defendants and Respondents.

Michael P. McNamara, Carol A. Gefis, Peterson, Oliver & Poll and Jeffrey T. Lauridsen for Defendant and Respondent.

## OPINION

**BEDSWORTH, J.**—This case arises out of the tragic death of a 12-year-old boy. Gayle Quigley is the mother of Andrew Wantland, who died after unsuccessful attempts to treat with spiritual healing methods of the Christian Science church (Church) what turned out to be a case of juvenile diabetes. Following Andrew's death, Quigley sued the Church and various of its members who participated in his treatment, as well as his grandmother, alleging that each had breached a duty of due care when they failed to refer Andrew to conventional medical practitioners after it became reasonably clear the Christian Science treatment was proving ineffective. After giving Quigley an opportunity to allege additional facts establishing the existence of a duty, the trial court sustained the demurrers of the Church and its members and granted judgment in their favor. The court later granted summary judgment in favor of Andrew's grandmother, also on the basis that she owed no duty under the circumstances. Quigley appealed from both these judgments and her appeals were consolidated. Although we share Quigley's belief that a referral to medical treatment was advisable under the circumstances of this case, we cannot agree California law imposed a legal *duty on* these defendants to seek it, and we therefore affirm the judgments.

I

*The Demurrers*

A. *Facts and Procedural History*

On review of a judgment entered after an order sustaining a demurrer, we must assume the truth of all facts properly pleaded. (*Pacific Gas & Electric Co.* v. *City of San Jose* (1985) 172 Cal.App.3d 598 [218 Cal.Rptr. 400].) Quigley's second amended complaint alleges she and her ex-husband, James Richard Wantland (James) had joint legal and physical custody of their son, James Andrew Wantland (Andrew), but that in 1992, Andrew was living with James in California. Sometime during the fall or winter of 1992, Andrew became ill, and his illness progressed substantially between December 11 and December 20, when he died.

Andrew complained about his illness no later than December 16, and on December 20, the day of his death, he was emaciated, vomiting and had a frequent need to urinate. Just prior to his death, Andrew's symptoms included an inability to eat, drink, make eye contact, communicate, or move around. On the afternoon of December 20, James called "911" and summoned an ambulance. Upon arrival at the hospital, Andrew was pronounced dead of what was later determined to be the effects of juvenile diabetes.

No effort to secure medical treatment for Andrew was made until that "911" call, nor was any attempt made to inform or consult with Quigley about her son's condition. Instead, James initially chose to rely upon Christian Science treatment, which classifies disease to be an "error of the mind" and therefore discourages the use of medicine.

The church has established a system to administer Christian Science treatment to children of Christian Science parents, which includes a national manager of committees on publication (Manager), local committees on publication (CoP) and practitioners and nurses. The CoP, which is actually a single-person "committee," provides advice over the telephone to Christian Science parents, practitioners and nurses concerning treatment and legal issues. Among other things, the CoP encourages parents to retain Christian Science practitioners and nurses, and counsels practitioners and nurses who are directly treating the patient. The CoP also reports an ill child to the national Manager.

The Church controls which practitioners and nurses treat children by certifying their training, by listing them in the *Christian Science Journal*, and

by encouraging members to retain only "Journal-listed" nurses and practitioners. Thus, Journal-listed practitioners and nurses are individuals who have demonstrated their moral character and "healing ability" to the satisfaction of the Church.

Christian Science practitioners provide prayer treatment for their patients. Such prayer can be conducted from a distant location, a practice known as "absent treatment," although that is discouraged when the patient is a seriously ill child. Instead, practitioners are encouraged by the church to personally visit with seriously ill children. Practitioners determine their own fees, if any, and are usually paid by the patient's family.

Christian Science nurses provide only "practical care" to the patient. Standard training for nurses covers only how to bathe and feed patients and how to change bed linen. Nurses are actually trained to view the patient as healed, and "not see the reality of the physical symptoms." Nurses relay their observations regarding the patient's condition to the practitioner, who then provides the Christian Science prayer treatment. It is considered unethical for accredited Christian Science practitioners and nurses to treat a patient who is also relying upon medical care.

Respondent Ann McCann, a Journal-listed practitioner, was contacted by telephone about Andrew's condition no later than December 17, 1993, and provided only absent treatment from her home. McCann continued to receive telephone calls regarding Andrew's condition until December 20, the date of Andrew's death. McCann made no attempt to inform Quigley, Andrew's mother, about the treatment.

Respondent Laura Armstrong, a Journal-listed nurse, was the on-call nurse for respondent Christian Science Visiting Nurse Service of Los Angeles County, Inc. (the Service) on December 20. Armstrong was summoned to Andrew's home shortly before noon, having been told "there was a very sick" 12-year-old boy. Armstrong arrived at the home at approximately 12:40, and immediately requested James sign a form providing, among other things, that the custodial parents agreed to rely upon Christian Science treatment. Although the document provided a signature line for both mother and father, Quigley was not contacted nor given the opportunity to consent.

During the period she cared for Andrew, Armstrong observed he was not talking, making eye contact, or noticeably responding to people and his breathing was quick and abnormal. Because she felt unable to help Andrew, Armstrong consulted with another nurse from the Service later that afternoon. The second nurse advised her to insist that Quigley be called. However, Andrew's father and grandmother decided to call "911," rather than Quigley.

Respondent Robert Gilbert, the CoP for Southern California, received telephone calls informing him of Andrew's condition at 11:30 a.m., noon, and 1:15 p.m. on December 20. Gilbert, in turn, contacted the Manager at 11:51 a.m., 12:23 p.m. and 1:24 p.m. Gilbert advised James and Armstrong of their legal rights and recommended that James retain a local Journal-listed practitioner who could visit Andrew. Gilbert never suggested anyone contact Quigley or secure medical care.

The Church, Gilbert, McCann, the Service and Armstrong each demurred to the second amended complaint, contending, among other things, it did not sufficiently allege the existence of a duty. The trial court sustained the demurrers without leave to amend.

### B. *Discussion*

Quigley contends the trial court erred in sustaining the demurrers, because she had "not yet had an opportunity to fully explore all the facts . . . through discovery" and "the majority of the issues are factual in nature and not subject to demurrer." Quigley's first argument fails because our record reveals she actually did engage in substantial discovery prior to the court's ultimate entry of summary judgment in favor of Andrew's grandmother, Ruth Wantland, but has nonetheless failed to identify any new facts discovered—or even anticipated—which might have altered the court's analysis of the duty issue. Her second argument fails because the existence of a duty, the issue upon which the demurrers were sustained, is an issue of law, not an issue of fact. (*Parsons* v. *Crown Disposal Co.* (1997) 15 Cal.4th 456 [63 Cal.Rptr.2d 291, 936 P.2d 70].)

Quigley next argues the court improperly relied upon *Nally* v. *Grace Community Church* (1988) 47 Cal.3d. 278 [253 Cal.Rptr. 97, 763 P.2d 948], in concluding the demurring defendants owed no duty to Andrew. In *Nally*, the Supreme Court concluded a spiritual counselor has no duty to prevent a person's suicide by referring him to licensed mental health professionals, even when that suicide becomes a "foreseeable risk." The decedent was 24-year-old Kenneth Nally, who had been experiencing problems with depression for a period of years before his suicide, and had unsuccessfully attempted suicide a month before his death. During the years of his depression, Nally had received not only regular spiritual counseling from pastors at his church, but also medical and psychological treatment at various times.

After Nally's initial attempt at suicide, and while still in a hospital, he informed two of his pastoral counselors he was "sorry he did not succeed." (*Nally* v. *Grace Community Church, supra,* 47 Cal.3d at p. 286.) Apparently

the pastors assumed hospital personnel were also aware of Nally's death wish, and did not inform anyone of it. Shortly before his suicide, Nally questioned another pastoral counselor about whether a Christian who committed suicide would nonetheless be "saved." Nally was assured that " 'a person who is once saved is always saved.' " (*Ibid.*)

After his second—successful—suicide attempt, Nally's parents sued, contending his pastoral counselors were obligated to do more to prevent his suicide. The Supreme Court disagreed, holding instead that unlicensed spiritual counselors had *no duty* to prevent even a foreseeable suicide, and no general professional duty of care. The court began with the proposition that "one is ordinarily not liable for the actions of another and is under no duty to protect another from harm, in the absence of a special relationship of custody or control," (*Nally* v. *Grace Community Church, supra*, 47 Cal.3d at p. 293) and then analyzed various factors in determining whether the services offered by a spiritual counselor created such a "special relationship." In determining no special relationship was created, the court expressed particular concern that imposing a duty to refer "may stifle all gratuitous or religious counseling," and concluded "[m]ere foreseeability of the harm or knowledge of the danger, is insufficient to create a legally cognizable special relationship giving rise to a legal duty to prevent harm." (*Id.* at p. 297.)

Quigley, while acknowledging some similarity between *Nally* and this case, attempts to distinguish it on the basis the decedent in *Nally* was an adult who made a voluntary choice to seek pastoral counseling, whereas in this case Andrew was a mere child who was not in a position to exercise choice in his treatment options. According to Quigley, the doctrine of *parens patriae* requires higher standards be imposed on those who render services to a child. However, Quigley misapplies the *parens patriae* doctrine, which refers to the traditional role and obligation of the *state* to act as guardian of children and other incompetents (see, e.g., *In re Roger S.* (1992) 4 Cal.App.4th 25 [5 Cal.Rptr.2d 208]) when she suggests we apply it to create a general duty of care owed by all persons toward children. We decline to do so. (See *Mirkin* v. *Wasserman* (1993) 5 Cal.4th 1082, 1104-1105 [23 Cal.Rptr.2d 101, 858 P.2d 568] [noting "courts 'should be hesitant to "impose [new tort duties] when to do so would involve complex policy decisions" [citation], especially when such decisions are more appropriately the subject of legislative deliberation and resolution' "].) Moreover, Quigley's attempt to focus the analysis on Andrew's purported lack of choice is disingenuous. As is the case with virtually all children, Andrew's treatment was chosen by a qualified adult, in this case his father James, who had the legal duty to do so. Any concerns about that choice are appropriately directed toward James. (See *Walker* v. *Superior Court* (1988) 47 Cal.3d. 112

[253 Cal.Rptr. 1, 763 P.2d 852] [a parent can be found criminally negligent for relying exclusively on prayer treatment for a seriously ill child].)

The presence and involvement of Andrew's father during his treatment also undercut Quigley's argument that the Christian Science healers had "a great deal more control over Andrew's environment than did the church officials in *Nally.*" According to Quigley's argument, the fact Andrew "was not a physically healthy adult free to arrange his affairs as he sought [*sic*] fit . . . caused him to have a direct and dependent relationship with his healers." Of course, that is simply not true. Andrew's dependency was on his father, who *was* a physically healthy adult free to arrange Andrew's affairs as he saw fit.

Quigley also attempts to distinguish *Nally* by arguing that imposing a duty on Christian Science healers to refer patients to medical care would not have a chilling effect on religious freedom. We disagree. Quigley's own complaint alleges that medical treatment is inconsistent with the tenets of the Christian Science faith, and it is considered "unethical" to provide Christian Science treatment to any patient receiving medical care. Under those circumstances, imposing any duty upon Christian Science healers which required them to encourage patients to seek medical care would directly interfere with their own religious practices. We can hardly conceive of a more chilling effect. *Nally* is simply indistinguishable.

Finally, unable to distinguish *Nally*, Quigley attempts to avoid it by arguing the demurring defendants voluntarily assumed a duty of due care regarding Andrew's illness, because "Andrew's *physical well-being* was entrusted to defendants' nationally coordinated system for treating seriously ill children." That contention, however, reveals the most fundamental flaw in Quigley's analysis. As Quigley expressly acknowledges in her complaint, Christian Science treatment is intended to address only a *spiritual* problem, *not a physical one*, since Christian Science perceives disease to be an "error of the mind." Indeed, Quigley specifically alleges that Christian Science healers are trained "to not see the reality of the physical symptoms and to see the patient as healed." In this case, the fact that Andrew's problem turned out not to be spiritual, but was instead physical in nature, i.e., juvenile diabetes, does not change the fact that the demurring defendants undertook no responsibility to evaluate the severity of, or otherwise address Andrew's physical condition or medical needs. Indeed, given their particular beliefs, Christian Science healers are perhaps the group *least* qualified to carry out such a duty and *least* likely to assume it. The demurrers were properly sustained.

## II

### *The Summary Judgment*

#### A. *Facts and Procedural History*

Rather than demurring to the second amended complaint, Andrew's grandmother Ruth answered it, but subsequently moved for summary judgment on the duty issue. ■ "On review of an order granting or denying summary judgment, we examine the facts presented to the trial court and determine their effect as a matter of law. . . . Duty, being a question of law, is particularly amenable to resolution by summary judgment." (*Parsons* v. *Crown Disposal Co., supra,* 15 Cal.4th at pp. 464-465.)

■ According to the allegations of Quigley's complaint, the duty Ruth allegedly breached is the one embodied in Penal Code section 273a, which imposes liability on any person who "under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering . . . ."

In support of her motion for summary judgment, Ruth asserted facts which were largely undisputed by Quigley. Quigley and her ex-husband James were the custodial parents of Andrew, with James acting as primary custodial parent. Ruth was not a legal custodian or guardian, and had no written authorization to seek medical care for Andrew. Andrew's diabetic condition was not diagnosed or known to his family, including Ruth, prior to his death. During the week before his death, Andrew engaged in numerous activities, including helping to repave the driveway, going to school, going out to eat, and running errands.[1] Although many people came into contact with Andrew during the week before his death, none thought his condition to be serious until the day of his death. James decided to keep Andrew at home on the afternoon of December 19, and James, who was authorized to decide whether and when to seek medical treatment, made the decision to rely upon Christian Science treatment on December 20.[2] However, upon realizing

---

[1] In response to the assertion Andrew engaged in numerous activities, Quigley offered evidence that Andrew stayed home from school during part of that week. She does not, however, dispute the other activities listed by Ruth.

[2] In response to the factual assertion that James decided to engage Christian Science care on December 20, Quigley contends Ruth initially sought Christian Science treatment for Andrew on December 17, and James initially sought it on December 19. Even if true, however, those facts do not create a dispute regarding who made the decision to rely on Christian Science treatment on December 20.

Andrew was seriously ill, it was also James who decided to terminate Christian Science treatment and seek medical care.[3]

In connection with her opposition to the motion, Quigley offered additional facts which she contended established triable issues of fact regarding the existence of Ruth's duty. According to Quigley, Ruth acted as primary caregiver for Andrew on the Wednesday, Thursday, Friday and part of Saturday prior to his death on Sunday, December 20. Ruth provided food, housing, clothing, rules for Andrew's behavior, and made decisions regarding Andrew's schooling and health care. Ruth also actively participated in securing Christian Science care for Andrew on the day of his death, and discouraged the Christian Science nurse from contacting Quigley, by informing her Quigley "was not in the picture."

However, those conclusions regarding Ruth's role in caring for Andrew in the days prior to his death were not entirely supported by the evidence Quigley cited. Instead, Quigley's evidence demonstrated only that Andrew spent a substantial amount of his time at Ruth's house during the few days before his death, and did not go to school on Wednesday, Thursday or Friday. Contrary to the implication of Quigley and our dissenting colleague, there was no evidence Andrew appeared to be sick during the time he was with Ruth. The only thing Andrew had complained of was aching teeth in the wake of having his braces tightened on Tuesday, December 15. It was the aching teeth, not some other illness, which caused Ruth to suggest he contact his orthodontist and a Christian Science healer while he was in her care. The sore teeth, combined with his desire to ensure completion of a rebuilt motorcycle that was to be his Christmas present, were also the reason Andrew stayed out of school, and at his grandparents' house, during the week before his death. Included among Andrew's many activities during the time he was out of school were several trips to Honda dealerships to obtain parts for the motorcycle.

The evidence also did not establish James had ceded parental responsibility to Ruth, or that Ruth was actually making decisions regarding Andrew's school attendance or health care. In fact, the evidence relied upon by Quigley revealed James had also spent substantial time with Andrew during those last days, including portions of the time Andrew was at Ruth's house, and had personally made arrangements for Andrew's health care by arranging the visit to the orthodontist. The fact Andrew felt free to accept her

---

[3]In response to the factual assertion it was James who made the decision to seek medical care, Quigley merely states "[u]ndisputed that at some point James called an ambulance." Such quibbling over language, while omitting any citation to evidence to dispute the contention, does not create a dispute of fact.

suggestion he contact a Christian Science healer for his aching teeth, and reject her suggestion he contact his orthodontist, belies Quigley's assertion Ruth was making health care decisions for him.

## B. *Discussion*

The court's decision to grant summary judgment relied heavily on *People v. Heitzman* (1994) 9 Cal.4th 189 [37 Cal.Rptr.2d 236, 886 P.2d 1229]. In *Heitzman*, the Supreme Court analyzed the duty of care owed to a dependent elder under Penal Code section 368, subdivision (a), which tracks the language of section 273a, the child abuse statute relied upon by Quigley in her complaint. The court held that an adult daughter, who was aware her father was being grossly neglected, but was not her elderly father's actual caretaker, had no legal duty to prevent that neglect. The court specifically relied upon tort principles in concluding a legal duty of care can be imposed only upon a person with actual custody and control over the dependent, or upon a person with the *legal duty* to control the person with custody or control.

Our own analysis of Quigley's contentions on appeal are complicated by the extraordinary fact that Quigley ignores *Heitzman* in her opening brief.[4] We therefore must construe her arguments, as best we can, in light of the principles enunciated in *Heitzman*. ■ In essence, Quigley argues summary judgment was improper because Ruth's course of conduct in caring for Andrew during the week before his death, as well as her participation in his care on the day of his death, is evidence she was acting in a parental role, *jointly* with James, during "the crucial hours on [the date of Andrew's death]" and thus assumed the direct duty of a custodian. The problem with this argument is the evidence reveals nothing more than Ruth's acting as a babysitter, with the consent of Andrew's father, at various times during the week before Andrew's death, when it was undisputed Andrew did not appear to be seriously ill. ■ We reject Quigley's implicit assertion that merely agreeing with a parent to look after his child, off and on, for a period of a few days, would somehow transform the caretaker into a de facto parent, with legal rights and responsibilities coequal to the actual parent.

Of course, the fact that Ruth occupied the status of babysitter, rather than parent, during the week before Andrew's death, does not mean she owed him

---

[4]In her reply brief, Quigley defends that omission by arguing *Heitzman* has no application because her complaint contained several causes of action, only one of which alleged violation of the criminal child abuse statute and others of which relied upon common law tort principles. However, the Supreme Court specifically relied upon common law tort principals to ascertain the existence of a duty in *Heitzman* (*People v. Heitzman, supra,* 9 Cal.4th at p. 212), and Quigley fails to explain why that analysis would not then properly be applied to her common law tort claims.

no duty of care. Clearly she assumed certain responsibilities by agreeing to act as babysitter. This is, however, the point at which we part company with our dissenting colleague. He would hold that our analysis ends with a determination that Ruth owed some duty to Andrew by acting as a babysitter, and would leave to the jury to determine whether that undefined duty was breached. We cannot agree. As our Supreme Court made abundantly clear last year in *Parsons v. Crown Disposal Co., supra,* 15 Cal.4th 456, part of the court's responsibility in evaluating whether a duty was owed is defining *what that duty would be.*

In *Parsons,* plaintiff sued a garbage company after the noise from one of its trucks spooked her horse in Griffith Park. The trial court entered summary judgment, finding no duty was owed. The Court of Appeal reversed, relying upon the same analysis employed by the dissent here; i.e. that a duty was owed and it was for the jury to decide whether that duty was breached. The Supreme Court disagreed and reinstated the summary judgment. The court made clear it is not sufficient to conclude merely that a duty exists. Indeed, the court began its analysis by noting "[a]s a general rule, each person has a duty to use ordinary care." (15 Cal.4th at p. 472.) It also agreed that the garbage company had a "limited common law duty" to avoid frightening horses with its machinery. (*Id.* at p. 477.) However, based upon the factors enunciated in *Rowland v. Christian* (1968) 69 Cal.2d 108,112-113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496], the court rejected the suggestion that the company owed "an expansive duty to guard against frightening horses," as plaintiff claimed. (15 Cal.4th at p. 477.) Because there was no evidence the defendant had breached the limited duties it did owe, the court concluded summary judgment was appropriately granted.

Applying *Parsons* to this case, it is clear our analysis does not end upon determination that Ruth, as a babysitter, owed some duty of care. Instead, we must specifically evaluate whether Ruth's obligations as a babysitter encompassed a duty to do the thing she is accused of failing to do here: i.e., seek medical care for a child who did not appear to be seriously ill, and whose parent had not elected to do so.[5] In our view, they do not.

Under *Rowland v. Christian, supra,* 69 Cal.2d 108, the factors to be considered in determining whether a duty exists are: (1) the foreseeability of

---

[5] There is no evidence that Andrew "became ill" during the time he was in Ruth's care, despite our dissenting colleague's desire to frame the issue that way. There is no evidence Andrew's condition, juvenile diabetes, became symptomatic during that time. All the evidence is that it did not, which makes it difficult to understand the efficacy of the trial the dissent calls for.

We therefore express no opinion about a babysitter's duties when a child becomes ill during the period of care. Absent an emergency, it may be the only duty is to contact the parent. In this case, it is undisputed Andrew's father James was also present during a

harm to the plaintiff; (2) the degree of certainty the plaintiff would suffer injury; (3) the closeness of the connection between the defendant's conduct and the injury suffered; (4) the moral blame attached to the defendant's conduct; (5) the policy of preventing future harm; (6) the extent of the burden to the defendant; (7) the consequences to the community of imposing a duty to exercise care with resulting liability for breach; and (8) the availability, cost and prevalence of insurance for the risk involved. (*Id.* at p. 113.)

 In this case, the fact that Andrew was active and appeared to be reasonably healthy on the Wednesday, Thursday and Friday Ruth took care of him strongly suggests she had no duty as a babysitter to seek medical care for him during that period. Under those circumstances, his subsequent death from lack of medical care was neither foreseeable nor certain. Ruth's failure to seek medical care also was not directly connected to Andrew's death, since any failure on her part could have been cured by James's seeking prompt medical care once Andrew was back at home. Little moral blame attaches to the failure to obtain medical care for a child who does not appear to be seriously ill and whose parent is in a position to evaluate his condition.[6]

The policy of preventing future harm would not likely be significantly advanced by imposing a duty on a babysitter to seek medical care under these circumstances. Although there may be rare cases, admittedly including the instant one, where a parent might be unusually resistant to medical care, the child may be deceptively asymptomatic, and a referral to medical care would have saved a life, we cannot fashion a duty applicable to all which is justified only in such rare instances. In the ordinary case, imposing such a duty would encourage babysitters to protect themselves from liability by seeking medical care whenever a child complained of an upset stomach, headache or slight fever, even though the parent, whose knowledge of the child's health and medical history is more comprehensive, had decided on a different course. In fact, such a rule would be particularly pernicious if the

---

substantial part of the three-day period during which Ruth periodically babysat, and was equally able to evaluate Andrew's need for medical care.

[6]The fact that Ruth was Andrew's grandmother, rather than a neighborhood teenager or a professional child care worker, might cause one to argue she had a greater moral responsibility, and thus a greater moral blame, in this case. However, there is no authority for the proposition that grandparents have a greater duty or right to intervene in parental decisions than anyone else, even if they might be more *inclined* to do so. (See Fam. Code, § 3930 ["A parent does not have the duty to support a child of the parent's child."].) Indeed, Quigley does not even argue that Ruth's duty stemmed from her status as a grandparent, and did not sue Andrew's grandfather (Ruth's husband) despite the fact he also spent substantial time with Andrew during the Wednesday—Friday period. Instead, Quigley relies upon the argument that Ruth assumed a duty toward Andrew by agreeing to take responsibility for his care and preventing others from doing so.

child in question had specialized needs and a complicated medical history unknown to a temporary caretaker.

Similarly, we think imposing a duty on a babysitter to be responsible not only for health problems arising during care, but also for preexisting conditions with symptoms (such as they are) known to the parent, imposes too big a burden. Babysitters, as temporary caregivers, generally do not have as much information about a child's day-to-day needs as a parent, and are therefore handicapped in evaluating health care needs. And if such liability could be imposed upon a babysitter, we cannot see why it would not also be imposed upon teachers, scout leaders, field trip supervisors and anyone else who takes temporary charge of a child.

The consequences to the community also militate against imposing such a duty. Parents have the legal right and duty to make health care decisions for their children. (See Fam. Code, § 6910.) Imposing a coequal duty upon temporary caregivers would encourage conflict and potentially undermine that parental authority. Indeed, the Legislature has clearly expressed a policy favoring primacy of parental responsibilities in the health care area. Family Code sections 6550 and 6552 provide that even when the minor *resides* with a family member other than the parent or guardian, that caregiver can authorize medical treatment for minors only after executing a declaration swearing they have either advised the parent or guardian of their intent, or were unable to contact them. Even then, any decision of such residential caregiver is superseded by any contravening decision of the parent or guardian which does not endanger the child.[7]

In light of the clear policy expressed by the Legislature, we cannot say that a babysitter has any duty to seek medical care for a child who does not appear to be seriously ill and whose parent is in a position to personally evaluate the child's condition and has elected not to seek such care.[8] However, we must also emphasize we are not faced here with the situation

---

[7] We cannot evaluate the final *Rowland* factor, the availability, cost and prevalence of insurance, as we have no facts before us pertaining to that issue. However, in light of our evaluation of the other factors, we would not impose a duty even if insurance were inexpensive and readily available.

[8] In our view, the dissent's reliance on *Lundman* v. *McKown* (Minn.Ct.App. 1995) 530 N.W.2d 807, is misplaced. In *Lundman,* a case factually similar to this one, the court concluded the stepfather of a child treated with Christian Science care owed him a duty to seek medical care. The court justified its conclusion in two ways. First, it held that the stepfather had "accepted a responsibility to protect" the child by participating in his Christian Science care. (*Id.* at p. 820.) However, as we explained in relation to the Christian Science defendants in this case, we do not believe that one who voluntarily accepts responsibility for a child's spiritual healing would automatically become responsible for addressing that child's medical needs or any other aspect of his general well being. (See *Williams* v. *State of*

of a medical emergency arising during the tenure of a babysitter's care and unknown to the parent, and we do not express any opinion regarding the scope of a babysitter's duties, either to contact the parent or guardian, or to seek direct medical attention, under those circumstances.

Having concluded that Ruth had no legal obligation to seek medical care for Andrew during the period she babysat him, we now turn to the crucial period when Andrew's illness revealed itself to be serious. Andrew had returned to his own home on December 19, and was thereafter under the care of James. According to undisputed facts, it was James who then made the treatment decisions for Andrew. The fact that Ruth was present during the crucial time period, and even assisted James in carrying out his treatment decisions, was insufficient to either transform Ruth into a legal "custodian" under *Heitzman* or to suggest she might have had any legal duty to control James.[9]

Quigley also relies upon *Williams* v. *State of California, supra,* 34 Cal.3d 18, in arguing Ruth assumed a duty of care to Andrew because she "isolated him from other caregivers." However, Andrew's legal caregiver was James, who was present and involved in Andrew's care during the entire relevant period, and was actually making the treatment decisions. There is likewise no merit in the contention Ruth was responsible for preventing Andrew's access to Quigley herself, merely because Ruth informed the Christian Science nurse that Quigley was "not in the picture" on the day of Andrew's death. The decision to contact Quigley was one to be made by James, not Ruth, and there is no indication Ruth prevented the nurse from discussing that issue with James.[10]

Finally, Quigley also contends the trial court erred in granting summary judgment because the "attributes of the relationship between [Ruth] and [Andrew] . . . establish a triable issue as to whether sufficient steps were

*California* (1983) 34 Cal.3d 18 [192 Cal.Rptr. 233, 664 P.2d 137], in which the court concluded that highway patrolmen who came to the aid of an injured motorist and investigated the cause of her accident assumed no related duty to preserve evidence for her civil suit.) The second justification given by the *Lundman* court was that custodial stepparents (and "visitation" stepparents during visitation) presumptively assume parental responsibility for their stepchildren by virtue of their marriage. In other words, the *Lundman* court concluded a stepparent is presumptively a de facto parent, the very argument we have already rejected as applied to Ruth in this case.

[9] In *Heitzman,* the defendant daughter was present in the home where her father lived a substantial part of the time, including spending many nights, and did initiate and participate in discussions about her father's condition and medical needs.

[10] There is also no evidence the nurse was persuaded of Quigley's unavailability by Ruth's comment. To the contrary, when the nurse subsequently concluded Andrew was seriously ill, she renewed her suggestion Quigley be contacted. James decided instead to call "911."

taken to protect Andrew." That argument, however, misses the point of the summary judgment ruling, which was based upon the determination Ruth *did not owe any duty,* not upon a conclusion she had taken sufficient steps to fulfill it.

### III

The judgments are affirmed. Respondents are to recover their costs.

**SONENSHINE, Acting P. J.,** Concurring.— I concur but write separately because I find Justice Bedsworth's analysis of Ruth's summary judgment motion unnecessarily complicated.

The only issue we need address is whether Ruth owed Andrew a duty of care. Our dissenting colleague and Quigley maintain Ruth's actions of coming to Andrew's aid and isolating him from other caregivers created this duty. I would agree with this legal conclusion if the record supported the factual premise. It does not.[1]

Andrew's general condition the week before his death and Ruth's involvement with him during that time are undisputed. Andrew went to restaurants, helped repair the family driveway, and ran various errands. People who saw him, including his orthodontist, verified he did not appear symptomatic until the day he died.

Ruth was with Andrew on Monday, December 14, for a few hours at his house after he went to school. On Tuesday the 15th, Andrew went to school and Ruth did not see him. He stayed at Ruth's house on the 16th, and although he did not go to school, his symptoms were minimal. Andrew missed school on the 17th and 18th. He slept at Ruth's home both nights, but spent just part of the day there. Again nothing in the record indicates he was seriously ill at this time. The state of his health is not contested. Simply stated, neither party alleges he appeared to be sick. Andrew left his grandmother's on Saturday the 19th and ate lunch at a restaurant with his father and sister. Ruth did not see him again that day but visited with him on Sunday, the day he died.

"One who, being under no duty to do so, takes charge of another who is helpless adequately to aid or protect himself [or herself] is subject to liability

---

[1]Quigley also maintains Ruth's status as a grandmother, Christian Scientist and health practitioner invested her relationship with Andrew with elements of trust and dependence customarily found in a special relationship. Quigley fails to cite any relevant authority for this position. The two cases upon which Quigley does rely involve defendants who induced or prevented *helpless victims* from seeking assistance. As I now explain, Andrew was never helpless while in Ruth's care.

to the other for any bodily harm caused to him [or her] by [¶] . . . the failure of the actor to exercise reasonable care to secure the safety of the other while within the actor's charge . . . ." (Rest.2d Torts, § 324, p. 139.)

Ruth was under no duty to exercise reasonable care to secure Andrew's safety *prior* to the last week of his life and nothing happened *during that time* to change this obligation. Andrew was not in need of help at any time he was with Ruth. On Monday, Ruth did nothing more than babysit a seemingly healthy teenager after school. The two had no contact on Tuesday. Ruth was with him on Wednesday. She suggested the Christian Science practitioner be contacted, but that was because Andrew's teeth hurt.[2] He spent part of Thursday and Friday at Ruth's but again the undisputed facts fail to establish his need for help. Andrew returned home on Saturday. The court did not err in granting Ruth's summary judgment motion. Quigley failed to establish Ruth owed a duty to Andrew.

**RYLAARSDAM, J., Concurring and Dissenting.—** ▆ I concur that the demurrers of the Christian Science church and its representatives were properly sustained. However, I respectfully dissent from my colleagues' decision to affirm the summary judgment in favor of Ruth Wantland, Andrew's grandmother. Mrs. Wantland assumed a duty of care towards Andrew when she undertook the role of babysitter and caretaker. Whether she breached this duty, that is whether she acted unreasonably in not seeking adequate medical care for him, is a question of fact which should not be decided by way of summary judgment.

Andrew died on December 20, 1992, a Sunday. Mrs. Wantland was solely responsible for his care for substantial periods during the preceding week. On December 14, she babysat Andrew after school. On December 16, Andrew did not go to school but spent the day at Mrs. Wantland's house. On December 17 and 18, he again missed school and spent a substantial portion of each day with Mrs. Wantland; he also spent these nights at her house. On December 19, he spent the morning with Mrs. Wantland and apparently returned to his father's house thereafter. Mrs. Wantland initiated contacts with representatives of the Christian Science church to make sure they knew Andrew needed help.

The lead opinion notes that "the fact that Andrew was active and appeared to be reasonably healthy on the Wednesday, Thursday and Friday Ruth took care of him strongly suggests she had no duty as a babysitter to seek medical care for him during that period." (Lead opn., *ante*, at p. 1040.) Justice

---

[2]The dissent suggests Ruth contacted the practitioner, but the record fails to support this contention.

Sonenshine's concurring opinion likewise stresses the allegations of Andrew's apparent health on the days preceding his death. This may well be true, although the father's decision to keep him out of school and Mrs. Wantland's inquiries concerning Christian Science treatment three days before Andrew's death do raise questions about the condition of his health. But whether these allegations are true or false merely raises questions of fact. As the child's caregiver, Mrs. Wantland owed Andrew a duty of care. The next question is: Did she breach that duty? A jury might well conclude that while he was under his grandmother's care, Andrew's condition was such that a reasonable person would not seek medical attention or that, in view of the father's decisions regarding Andrew's health care, Mrs. Wantland acted reasonably in neither seeking adequate medical care for him nor reporting the father's failure to obtain such care to the appropriate authorities. In the alternative, a jury might reach a contrary conclusion. In other words, whether Mrs. Wantland breached her duty of care, that is whether she acted reasonably under the circumstances, is a question of fact.

The Restatement Second of Torts provides guidance in determining Mrs. Wantland's duty of care: "One who, being under no duty to do so, takes charge of another who is helpless adequately to aid or protect himself is subject to liability to the other for any bodily harm caused to him by [¶] . . . the failure of the actor to exercise reasonable care to secure the safety of the other while within the actor's charge, . . ." (Rest.2d Torts, § 324.) The majority's reliance on *People* v. *Heitzman* (1994) 9 Cal.4th 189 [37 Cal.Rptr.2d 236, 886 P.2d 1229], to conclude Mrs. Wantland did not owe a duty of care towards Andrew, is misplaced. *Heitzman* held Penal Code section 368, subdivision (a) could not constitutionally be construed to impose a generalized duty on a child towards a disabled elderly parent. But the case did not hold that one who assumes a duty of care, be it to a parent, a grandchild, or a stranger, is immune from liability. Quite to the contrary, the case recognized that one assuming a duty of care towards an elderly person, such as a caretaker or custodian, who breaches that duty by "caus-[ing] or permit[ting] injury or physical endangerment will incur criminal liability . . . ." (9 Cal.4th at p. 214.)

In a different factual context, *Williams* v. *State of California* (1983) 34 Cal.3d 18 [192 Cal.Rptr. 233, 664 P.2d 137] states the general rule governing the duty of care owed by one who "undertakes to come to the aid of another." (*Id.* at p. 23.) The Good Samaritan "is under a duty to exercise due care in performance and is liable if . . . his failure to exercise such care increases the risk of such harm, . . ." (*Ibid.*) My colleagues are of course correct: A grandmother, by virtue of that status, does not owe a duty of care to her grandchild. However, any person, regardless of relationship, may

voluntarily assume such a duty and, if so, be liable for the negligent discharge of the duty.

*Lundman* v. *McKown* (Minn.Ct.App. 1995) 530 N.W.2d 807, is factually similar to the present case. There, a child named Ian died from juvenile-onset diabetes because his caretakers failed to obtain appropriate medical care. Ian's natural father sued the mother, who had custody, and her husband. The husband argued, as does Mrs. Wantland, "that he owed no legal duty to Ian because he was a stepparent and because [the mother] was solely responsible for making decisions about Ian's health care." (*Id.* at p. 820.) The Court of Appeals of Minnesota rejected his argument: "Although we recognize that, as a stepparent, William McKown usually had no 'final word' control over Ian's health care, we disagree that his relationship as a stepparent did not impose a duty of care." (*Ibid.*) The court went on to describe the responsibilities the stepparent assumed, which were very similar to those Mrs. Wantland assumed, and concluded "[t]hese facts support the finding that [the stepfather] knew of Ian's helplessness and the gravity of his situation, that he accepted a responsibility to protect Ian, and that a special relationship existed between the two." (*Ibid.*)

Neither *Parsons* v. *Crown Disposal Co.* (1997) 15 Cal.4th 456 [63 Cal.Rptr.2d 291, 936 P.2d 70] nor *Rowland* v. *Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496] detract from the conclusion that Mrs. Wantland had assumed a duty of care towards Andrew. *Parsons* teaches that (1) "[a]s a general rule, each person has a duty to use ordinary care," (2) it is a question of law, to be decided on a case-by-case basis "[w]hether a given case falls within an exception to this general rule," and (3) this decision is " 'but only an expression of the sum total of those *considerations of policy* which lead the law to say that the particular plaintiff is entitled to protection.' " (*Parsons* v. *Crown Disposal Co., supra,* 15 Cal.4th at p. 472, citing *Dillon* v. *Legg* (1968) 68 Cal.2d 728, 734 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316].)

In making this policy decision *Rowland* v. *Christian, supra,* 69 Cal.2d 108 tells us we should consider "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Id.* at p. 113.)

The lead opinion analyzes each of these factors premised on the assumption Andrew did not show symptoms of his fatal illness until the day he died.

In doing so, that opinion's author improperly places himself in the position of fact finder. The legal issue to be addressed, considering the factors noted in *Rowland* is not whether, under the specific facts of this case, as viewed most favorably for the defense, Mrs. Wantland owed a duty to obtain adequate medical care for Andrew. To so frame the issue is to invade the province of the fact finder.

The issue to be addressed is a more generic one: May a babysitter whose charge becomes ill be charged with a duty to obtain appropriate medical care? When the issue is thus framed an analysis of the *Rowland* factors leads to such an inescapable conclusion that the answer is in the affirmative that it is unnecessary to here review each of those factors. This answers the legal issue of duty. The rest is for the jury.

The summary judgment should be reversed and a jury should decide whether Mrs. Wantland breached the duty of care she assumed towards Andrew.